[Cite as *Mentor Exempted Village School Dist. Bd. of Edn. v. Lake Cty. Educational Serv. Ctr. Governing Bd.*, 2016-Ohio-7649.]

## IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| MENTOR EXEMPTED VILLAGE SCHOOL DISTRICT BOARD OF EDUCATION, | : | **O P I N I O N** |
| | : | |
| Plaintiff-Appellant, | : | |
| | | **CASE NO. 2015-L-135** |
| - vs - | : | |
| LAKE COUNTY EDUCATIONAL SERVICE CENTER GOVERING BOARD, | : | |
| | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 14 CV 000570.

Judgment: Affirmed.

*Christian M. Williams*, and *Megan D. Maurer*, Pepple & Waggoner, Ltd., Crown Centre Building, 5005 Rockside Road, Suite 260, Cleveland, OH 44131-6808 (For Plaintiff-Appellant).

*Matthew J. Markling*, McGown & Markling Co., LPA, 1894 North Cleveland-Massillon Road, Akron, OH 44333 (For Defendant-Appellee, Lake County Educational Service Center Governing Board).

*John D. Latchney*, O'Toole, McLaughlin, Dooley & Pecora, LPA, 5455 Detroit Road, Sheffield Village, OH 44054 (For Ohio Association of Educational Service Centers).

THOMAS R. WRIGHT, J.

{¶1} Appellant, the Mentor Exempted Village School District Board of Education (Mentor), appeals the trial court's decision denying its summary judgment

motion and granting summary judgment in favor of appellee, the Lake County Educational Service Center Governing Board (Lake ESC). The crux of the dispute is whether Lake ESC was required to use the state and local subsidies it received as a result of its service agreement with Mentor to solely pay for or offset the staff and services provided to Mentor. We affirm.

{¶2} Educational service centers (ESCs) were created by statute and have evolved into agencies designed to provide uniform educational services and programs to school districts in a geographic region to ensure that all districts receive the same basic educational services.

{¶3} School districts are permitted to contract with any ESC for certain educational services as spelled out in R.C. 3313.845. Since 2011, school districts with an average daily enrollment or membership (ADM) for a fiscal year of less than 16,000 must contract or align with an ESC pursuant to R.C. 3313.843 for designated, mandatory educational services. The participating or member school districts are permitted to cancel their alignment with an ESC with proper notice and align with a different ESC of its choosing. R.C. 3313.843(D)(1). However, "[t]he failure of a district board to notify an educational service center of its intent to terminate * * * shall result in renewal of the existing agreement for the following school year." *Id.*

{¶4} ESCs are funded several ways. First, an ESC receives a state subsidy, which changes annually, but has varied from $35 to $26 per ADM during the parties' recent history. Second, an ESC receives $6.50 per ADM from the state via local funds. Third, ESCs may also compete and receive federal and state grants.

2

{¶5} Mentor and Lake ESC[1] began contracting for educational services in 1991. Their initial agreements were voluntary and not mandated by statute. In 1995, Mentor and Lake ESC entered the City/County Contract, which states in part that either party may cancel the contract by board action. As part of this City/County Contract, Mentor agreed to pay Lake ESC an annual $15,000 administrative fee, in addition to the $6.50 per student subsidy and Lake ESC's state subsidy based on Mentor's enrollment. Brian Bontempo, Superintendent and CEO of Lake ESC, explained that this City/County Contract included a "gentleman's agreement" granting Mentor a credit toward the purchase of staff from Lake ESC in an amount equal to its Mentor-based subsidy. This agreement is memorialized in handwritten notes underneath the signature lines on page two of the City/County Contract.

{¶6} The parties relied on the 1995 City/County Contract as the governing agreement for several years, and the superintendents of each annually agreed to the additional services and/or staff to be provided under the agreement. In approximately 2006, Mentor and Lake ESC began drafting annual agreements that delineated the specific services that Lake ESC would provide to Mentor. These annual contracts were labeled "Interdistrict Service Agreements."

{¶7} Mentor and Lake ESC entered into their 2012-2013 Interdistrict Service Agreement, for services for the 2012-2013 school year and "in consideration of the promises and terms contained and pursuant to the provisions of Sections 3313.17, 3313.841, 3313.842, 3313.843, 3313.91 and 3323.08 of the Ohio Revised Code." It also states: "The [Lake ESC ] Board shall provide the services in the programs or service areas listed below: * * * SEE EXHIBIT A." Exhibit A lists four personnel by last

---

1. Lake ESC was formerly known as the Lake County Board of Education.

name, title, and annual salary under the heading "CITY/COUNTY FUNDS," and the box next to each is checked.

**{¶8}** This 2012-2013 Interdistrict Service Agreement also states in part, "The Board shall invoice the Participating Member District for all net costs (not covered by state and federal funds) to employ the personnel specified herein."

**{¶9}** The 2012-2013 Agreement also includes an automatic renewal provision, which states,

**{¶10}** "In consideration of the agreement by the Board [Lake ESC] to provide the services and programs contracted for as set forth herein and to facilitate the employment and/or retention of necessary personnel and programming, the Participating Member District [Mentor] agrees to provide written notice to the Board of its intention to withdraw from any one or more for the aforementioned programs or services for the upcoming 2012-2013 school year no later than February 25, 2012 if the participating district employs an administrator through the LCESC or March 1, 2012 for all other services. **The participating Member District must act upon board resolution and provide written notice to the Board of its intent to terminate this agreement by March 1, 2012, or for any succeeding school year, by January 1 of odd-numbered years. The termination shall be effective on June 30, 2012, or any odd-numbered year thereafter if notice is properly provided**. Unless such written notice is received by the Board from the Participating Member District as set forth herein, this agreement will be automatically renewed for the **following two school years pursuant to section 3313.843 of the Ohio Revised Code**." (Emphasis sic.)

4

{¶11} The parties' 2012-2013 Agreement further provides, "[a]ll applicable federal and state laws, regulations and/or rules shall govern the implementation of the services provided pursuant to this Agreement."

{¶12} This 2012-2013 Agreement was Mentor's mandatory ESC alignment agreement pursuant to R.C. 3313.843, but it likewise governed the parties' discretionary agreement entered under R.C. 3313.841.

{¶13} In May of 2013, Lake ESC voted to cancel its current educational services model effective July 1, 2013, based on its inability to maintain its prior obligation of offering Mentor a credit toward its purchase of educational services. Thus, Lake ESC notified Mentor via letter that it was terminating the parties' 1995 City/County Contract that provided Mentor with a credit or offset for its state and local subsidy for personnel. This May 20, 2013 letter states in part,

{¶14} "the Educational Service Center Governing Board has determined to implement the cancellation provision * * * effective July 1, 2013. * * * Please understand that the Educational Service Center will continue to provide programs, services, and personnel per the interdistrict agreement. However, the uncertainties about funding make cancellation of the City/County Contract advisable at this time."

{¶15} According to Bontempo, the letter was intended to notify Mentor that Lake ESC would continue to provide the requisite services under the parties' Interdistrict Service Agreement, but that it could no longer continue to offer the credit for personnel as it had in the past based on Mentor's enrollment since its prior practice was not financially sustainable.

5

{¶16} Mentor's Treasurer Daniel Wilson confirmed that Lake ESC informed Mentor that it would no longer be crediting Mentor with its fiscal year subsidy toward Mentor's purchase of personnel from Lake ESC. Wilson also acknowledged that the state school funding statutes are subject to frequent changes. Before Mentor received this notice, Lake ESC permitted Mentor to annually designate what services it received from Lake ESC. After receiving this cancellation letter, Wilson spoke with the Lake ESC treasurer who confirmed that Lake ESC would be using Mentor's state subsidy for Lake ESC's operational purposes and to offer uniform services for all of its member school districts.

{¶17} Beginning July 1, 2013, Lake ESC stopped providing Mentor with a credit toward Mentor's purchase of services as it had in prior years.

{¶18} Notwithstanding, Mentor and Lake ESC entered a new Interdistrict Service Agreement for the 2013-2014 school year. The parties' 2013-2014 Interdistrict Service Agreement provides in part,

{¶19} "In consideration of the promises and terms contained and pursuant to the provisions of Sections 3313.17, 3313.841, 3313.842, 3313.91 and 3323.08 for the Ohio Revised Code, the [Lake ESC] Board agrees to provide to the Participating District [Mentor] services listed in Exhibit A for the term of the 2013-2014 school years commencing July 1, 2013 and concluding June 30, 2014 pursuant to ORC."[2]

{¶20} The personnel listed under the City/County Funds column on Exhibit A attached to the 2013-2014 Agreement are the same four personnel listed on Exhibit A attached to the 2012-2013 Agreement. However, under the column labeled "2013-2014

---

2. The agreement's references to Revised Code Sections 3313.842 and 3313.91 are crossed out and initialed by Matthew Miller and Daniel Wilson.

Services Requested * * * Check to Continue Services * * *  Note any changes below[,]"

it states next to each person listed "Per Mentor – Separate[.]"  Furthermore, the boxes

next to each of these four personnel are not checked or marked in the 2013-2014

Agreement as they were in Exhibit A attached the 2012-2013 Agreement.

{¶21} The 2013-2014 Interdistrict Service Agreement also states:

{¶22} "The Board [Lake ESC] shall invoice the Participating District for all net

costs (not covered by state and federal funds) to employ the personnel specified herein

and any program overages. * * *

{¶23} "* * *

{¶24} "There are no provisions, terms, conditions or obligations other than those

contained herein, and this contract shall supersede all previous communications,

representations, or agreements, whether oral/spoken or written, between the parties."

{¶25} Mentor and Lake ESC again entered an agreement for the 2014-2015

school year.  This 2014-2015 agreement, however, is not identified as an Interdistrict

Service Agreement.  Instead, it is titled "R.C. 3313.845 Service Agreement" and states

that it is only for the services authorized under R.C. 3313.845 and that "nothing in this

Agreement shall be construed as an R.C. 3313.843 Agreement."

{¶26} This "R.C. 3313.845 Service Agreement" specifically provides under

subsection 3.e. that "The Board [Mentor] agrees to pay all expenses for personnel

employed by the Lake County ESC and assigned to work in the District, including, but

not limited to, salary, unemployment, health insurance, severance, liability insurance,

worker's compensation, and other fringe benefits."  It also provides that it is the "entire

7

agreement of the parties, and supersedes any previous agreements they have made, whether orally or in writing."

{¶27} In October of 2015, Mentor voted to terminate its Interdistrict Service Agreement with Lake ESC and enter a new contract with the Cuyahoga County Educational Service Center since it agreed to pass Mentor's state and local subsidies on to Mentor as a credit for services.

{¶28} Matthew Miller, Mentor superintendent, explained that he did not believe that Mentor needed an ESC since they have sufficient, in-house resources. Miller testified that Lake ESC has not refused to provide Mentor with any requested auxiliary educational services. Instead, Mentor wanted Lake ESC to provide it with credit or funding for its employment of four administrators like it had in the past. Miller believed that Lake ESC did not have a right to change this practice in light of the governing law and the parties' contract. Thus, Mentor claims because Lake ESC lacked the authority to amend the parties' 2012-2013 Agreement, it automatically renewed pursuant R.C. 3313.843(D)(1) and the renewal provision in their 2012-2013 Agreement.

{¶29} Mentor filed suit against Lake ESC, and with leave of court filed its second amended complaint March 2, 2015. Mentor asserts five counts including three claims for declaratory judgment, a claim for breach of contract, and one for unjust enrichment.

{¶30} The parties filed competing motions for summary judgment. The trial court granted Lake ESC's motion as to all claims and dismissed Mentor's complaint.

{¶31} Mentor presents one assignment of error and alleges, "the trial court erred when it granted Lake ESC's motion for summary judgment and denied Mentor's motion for summary judgment. (T.d. 89.)"

8

**{¶32}** Civ.R. 56(C) sets forth the summary judgment standard, stating in part:

**{¶33}** "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

**{¶34}** Accordingly, a trial court should grant summary judgment if the evidence shows:

**{¶35}** "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and after viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *Lang v. Holly Hill Motel, Inc.*, 4th Dist. Jackson No. 06CA18, 2007-Ohio-3898, ¶16, citing *Vahila v. Hall*, 77 Ohio St.3d 421, 429-30, 674 N.E.2d 1164 (1997).

**{¶36}** The moving party must first identify evidence affirmatively demonstrating that the nonmoving party cannot establish his or her claims. Civ.R. 56(C); *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Once the moving party satisfies his

burden, the nonmoving party must direct the court to specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher*, *supra*. Speculation and conclusory assertions are insufficient to satisfy the nonmoving party's reciprocal burden under Civ.R. 56(E) and withstand summary judgment. *Loveday v. Essential Heating Cooling & Refrigeration, Inc.*, 4th Dist. Gallia No. 08CA4, 2008-Ohio-4756, ¶9.

**{¶37}** An appellate court construes the facts in a light most favorable to appellant and reviews questions of law de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 1995 Ohio 214, 652 N.E.2d 684 (1995), citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.*, 64 Ohio St.3d 145, 147, 593 N.E.2d 286 (1992).

**{¶38}** R.C. Chapter 2721. authorizes actions for declaratory judgment and permits a trial court to determine the parties' rights and obligations under law or pursuant to written agreements.

**{¶39}** "The construction of contracts is a matter of law. *Cent. Funding, Inc. v. CompuServe Interactive Servs., Inc.*, 10th Dist. No. 02AP-972, 2003 Ohio 5037, ¶ 42, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. When construing a contract, a court's principle objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 1999 Ohio 162, 714 N.E.2d 898 (1999). 'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.' *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 31 Ohio B. 289, 509 N.E.2d 411 (1987), paragraph one of the syllabus. Thus, where the terms of a contract are clear and unambiguous, a court cannot look beyond the plain language of

the agreement to determine the rights and obligations of the parties. *Cocca Dev.*, 7th Dist. No. 08MA163, 2010 Ohio 3166, at ¶ 26, citing *Aultman Hospital Ass'n v. Community Mut. Ins. Co.* (1989), 46 Ohio St. 3d 51, 53, 544 N.E.2d 920 (1989). However, if a contract is reasonably susceptible to more than one meaning, then it is ambiguous and extrinsic evidence of reasonableness or intent can be employed. *Id.*, citing *City of Steubenville v. Jefferson Cty.*, 7th Dist. No. 07JE51, 2008 Ohio 5053, ¶ 22." *7 Med. Sys., LLC v. Open Mri of Steubenville*, 7th Dist. Jefferson No. 11 JE 23, 2012-Ohio-3009, ¶27.

**{¶40}** Further, courts should give the words or terms in an agreement their plain and ordinary meaning unless such a reading results in a manifestly absurd outcome or if there is clear evidence of a different meaning upon reviewing the entire agreement. *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241, 245, 374 N.E. 2d 146 (1978); *Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, ¶10.

<u>Mentor's first claim for declaratory judgment</u>

**{¶41}** Mentor's first claim for declaratory judgment, captioned "Regarding the Status of the Agreement," asks the court to determine that Mentor had the sole power to sever the parties' 2012-2013 Interdistrict Service Agreement, which it did not do until 2015. It further sought the court to declare that the 2012-2013 Interdistrict Service Agreement automatically renewed pursuant to its terms and under R.C 3318.843(D)(1), and that it remained in effect through June 30, 2015 because Mentor did not terminate it sooner. Mentor also claims that Lake ESC, without the authority to do so, attempted to terminate the parties' agreement effective July 1, 2013 and that since this date, Lake

11

ESC stopped providing its requisite educational services required under their agreement.

{¶42} Former R.C. 3313.843(B), 2011 Ohio SB 316 in effect at the time the 2012-2013 Agreement was entered, states in part:

{¶43} "(1) The board of education of each city, exempted village, or local school district with an average daily student enrollment of sixteen thousand or less, reported for the district on the most recent report card issued under section 3302.03 of the Revised Code, *shall* enter into an agreement with the governing board of an educational service center, under which the educational service center governing board will provide services to the district.

{¶44} "* * *

{¶45} "(3) Services provided under an agreement entered into under division (B)(1) or (2) of this section shall be specified in the agreement, and may include any of the following: * * * Services included in the agreement shall be provided to the district in the manner specified in the agreement. The district board of education *shall reimburse the educational service center governing board pursuant to section 3317.11 of the Revised Code.*" (Emphasis added.)

{¶46} Further, as Mentor contends, R.C 3318.843(D) provides the opportunity for a member school district to terminate an agreement with an ESC on or before a date certain, and if the school district does not, then the mandatory agreement for services renews. Former R.C 3318.843(D) states:

{¶47} "(1) An agreement for services from an educational service center entered into under this section may be terminated by the school district board of education, at its

option, by notifying the governing board of the service center by March 1, 2012, or by the first day of January of any odd-numbered year thereafter, that the district board intends to terminate the agreement in that year, and that termination shall be effective on the thirtieth day of June of that year. The failure of a district board to notify an educational service center of its intent to terminate an agreement by March 1, 2012, shall result in renewal of the existing agreement for the following school year. Thereafter, the failure of a district board to notify an educational service center of its intent to terminate an agreement by the first day of January of an odd-numbered year shall result in renewal of the existing agreement for the following two school years.

{¶48} "(2) If the school district that terminates an agreement for services under division (D)(1) of this section is also subject to the requirement of division (B)(1) of this section, the district board shall enter into a new agreement with any educational service center so that the new agreement is effective on the first day of July of that same year."

{¶49} The parties' 2012-2013 Agreement states it was entered pursuant to both the discretionary and the mandatory Revised Code provisions requiring alignment with an ESC and permitting a district to enter discretionary, additional agreements with an ESC for further services. The 2012-2013 Agreement states that it was entered pursuant to the terms of R.C. 3313.841, which permits exempted village school districts to contract with ESCs for certain, discretionary designated services. The 2012-2013 Agreement also states that it was entered pursuant to R.C. 3313.842, which also permits a school district to enter a discretionary agreement for joint courses and other shared educational programs. The 2012-2013 Agreement likewise states that it was entered pursuant to R.C. 3313.843, which includes the mandatory alignment provision

13

for exempted village districts with an average daily student enrollment of less than 16,000.

{¶50} Contrary to Mentor's allegations, nothing in former R.C 3318.843 *required* an ESC to credit its member districts with a credit in the amount of its state and local subsidies.

{¶51} Additionally, Lake ESC came forward with evidence establishing that the 2012-2103 Interdistrict Service Agreement terminated as of June 30, 2013, based on the parties' entering the 2013-2014 Interdistrict Service Agreement. The 2013-2014 Agreement states in part,

{¶52} "This agreement ~~and the ESC District Agreement~~[3] constitutes the entire understanding between the parties with respect to the services and the Participating District designated herein. Any changes to personnel or programs during this Agreement that are mutually agreeable shall likewise be in accordance with the terms of this Agreement and will not require further Participating Board action. **There are no provisions, terms, conditions or obligations other than those contained herein, and this contract shall supersede all previous communications, representations, or agreements, whether oral/spoken or written between the parties**. This Agreement may be amended in writing by the mutual consent of the Board and the Participating District." (Emphasis added.)

{¶53} Thus, Mentor's proposition that the 2012-2013 Interdistrict Service Agreement continued beyond its execution of the 2013-2014 Interdistrict Service Agreement is contrary to the plain language of the parties' subsequent agreement.

---

3. This language was crossed out and initialed by Matthew Miller and Daniel Wilson, who signed the contract on behalf of Mentor.

14

Since the 2013-2014 Agreement does not reference or encompass the 2012-2013 Agreement, and it clearly states that it supersedes all prior agreements, Mentor effectively terminated the 2012-2013 Agreement upon entering the 2013-2014 Agreement. Since the terms of the latter agreement are clear, we are precluded from looking beyond the four corners of the document to determine the rights and obligations of the parties. *Cocca Dev. Ltd. v. Mahoning County Bd. of Comm'rs*, 7th Dist. No. 08MA163, 2010-Ohio-3166, at ¶26, citing *Aultman Hospital Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53, 544 N.E.2d 920 (1989). Had Mentor intended for the terms of its prior, mandatory alignment agreement to continue, it could have referenced the same in the 2013-2014 Agreement or at a minimum eliminated the clause indicating that their 2013-2014 Agreement supersedes all others.

{¶54} Mentor also argues in part that the two agreements coexisted since they were completely unrelated. However, both are similar in title, form, and substance, and both include similar exhibits. Although the first contract is broader in scope based on its reference to additional sections of the Ohio Revised Code, a plain reading of the terms of the latter agreement does not reveal that the parites intended for both agreements to coexist.

{¶55} Additionally, the fact that the signatories to the 2013-2014 Agreement on behalf of Mentor, i.e. Treasurer Wilson and Superintendent Miller, made several changes to this agreement in advance of signing reflect that they had sufficient bargaining power and were not simply signing a form agreement. Thus, if Mentor were operating under the belief that its mandatory alignment agreement with Lake ESC continued to be governed by their 2012-2013 Agreement, Mentor should have added

15

language to this effect. If Mentor wanted to continue to receive credits in the amount of its state and local subsidies paid to Lake ESC, then "it was incumbent upon it to employ the language necessary to convey such intentions." *First Natl. Bank v. Heine*, 44 Ohio Misc.2d 11, 14, 541 N.E.2d 494 (M.C.1988).

**{¶56}** Further, the parties did not agree in their 2013-2014 Agreement that Lake ESC would provide Mentor with a credit or setoff based on its state and local Lake ESC's subsidies received. In fact, the parties did not address or agree to the terms of their mandatory alignment agreement in their 2013-2014 Agreement since they evidently could not agree. Notwithstanding, Mentor had the power to obtain its R.C. 3313.843(B)(1) mandatory ESC services from another ESC.

**{¶57}** Finally, assuming that the 2012-2013 Agreement was automatically renewed as Mentor contends, there is no language in the 2012-2013 Agreement mandating that the state and local subsidies that Lake ESC received based on Mentor's ADM must be spent solely on services for Mentor or that Mentor must be credited with an amount equal to these subsidies. The 2012-2013 Agreement's language requiring Mentor to pay for "all net costs (not covered by state and federal funds) to employ the personnel" does not by its plain terms require Lake ESC to use its subsidies solely for Mentor's personnel. Instead, this course of conduct was agreed upon by the parties pursuant to the "gentleman's agreement" entered with the parites' 1995 City/County Contract, and was not detailed in their 2012-2013 Agreement.

**{¶58}** Accordingly, Lake ESC was appropriately granted summary judgment as to Mentor's first claim for declaratory judgment since no genuine issue of material fact remains to be litigated on this issue.

<u>Mentor's second count for declaratory judgment</u>

{¶59} Mentor's second count for declaratory judgment, identified as "Regarding Defendant's Use of the FY 2014 Subsidy Payment," asks the trial court to determine that Lake ESC was not permitted to use Mentor's 2014 subsidy payment to pay for Lake ESC's operating costs. Instead it claims Lake ESC was *required* to pay for and offset the cost of services provided solely to Mentor, based on the alleged continuation of the parties' 2012-2013 Agreement and language in former R.C. 3313.843(G). Mentor asked the trial court to conclude that former R.C. 3313.843(G) mandated that Lake ESC's 2014 subsidy payment, based on Mentor's service agreement and enrollment numbers, be used by Lake ESC solely to pay for and offset services to Mentor. Mentor likewise sought the court to declare that Lake ESC was precluded from using its subsidy for any other purpose.

{¶60} As stated previously, however, Mentor and Lake ESC's 2012-2013 Interdistrict Service Agreement terminated upon the parties entering their 2013-2014 Interdistrict Service Agreement in June 2013. Thus, the parties' 2013-2014 Interdistrict Service Agreement governs this issue.

{¶61} As stated previously, the 2013-2014 Interdistrict Service Agreement provides in part,

{¶62} "In consideration of the promises and terms contained and pursuant to the provisions of Sections 3313.17, 3313.841, ~~3313.842, 3313.91~~ and 3323.08 for the Ohio Revised Code, the [Lake ESC] Board agrees to provide to the Participating District [Mentor] services listed in Exhibit A for the term of the 2013-2014 school years commencing July 1, 2013 and concluding June 30, 2014 pursuant to ORC."

17

{**¶63**} The personnel listed under the City/County Funds column on Exhibit A attached to the 2013-2014 Agreement are the same four individuals listed on Exhibit A, which is attached to the 2012-2013 Agreement. However, under the column labeled "2013-2014 Services Requested * * * Check to Continue Services * * * Note any changes below[,]" it states next to each person listed "Per Mentor – Separate[.]" Furthermore, the boxes next to each of these four personnel are not checked in the 2013-2014 Agreement as they were in Exhibit A attached the 2012-2013 Agreement.

{**¶64**} The 2013-2014 Agreement also states:

{**¶65**} "The Board [Lake ESC] shall invoice the Participating District for all net costs (not covered by state and federal funds) to employ the personnel specified herein and any program overages. * * *

{**¶66**} "* * *

{**¶67**} "There are no provisions, terms, conditions or obligations other than those contained herein, and this contract shall supersede all previous communications, representations, or agreements, whether oral/spoken or written, between the parties."

{**¶68**} Thus, contrary to Mentor's claim, the 2012-2013 Agreement does not govern the parties' agreement for services since the 2013-2014 Agreement governs this time period. Furthermore, the 2013-2014 Agreement *does not* indicate that Lake ESC was *required* to use its local and state subsidies based on Mentor's average daily enrollment to only pay for and offset the cost of services provided to Mentor.

{**¶69**} Mentor claims that former R.C. 3313.843(G) dictated the spending of Lake ESC's subsidies for services solely to Mentor. Former R.C. 3313.843(G), 2013 Ohio HB 59, states in part,

18

**{¶70}** "(1) For purposes of calculating any state subsidy to be paid to an educational service center *for services provided to a school district*, the service center's student count shall be the sum of the total student counts of all the school districts with which the educational service center has entered into an agreement under this section.

**{¶71}** "(2) When a district enters into a new agreement with a new educational service center, the department of education shall ensure that the *state subsidy for services provided to the district is paid to the new educational service center* and that the educational service center with which the district previously had an agreement is no longer paid a state subsidy for providing services to that district." (Emphasis added.)

**{¶72}** We disagree and find that nothing in former R.C. 3313.843(G) dictates how an educational service center is to spend its state subsidy. Instead, it sets forth how the funds are to be calculated, and it also details that the state funds follow a participating district when it aligns with a different ESC.

**{¶73}** Further, a review of the statutes encompassed in the parties' 2013-2014 Agreement, in effect at the time, likewise does not dictate the outcome advanced by Mentor. Again, the 2013-2014 Agreement was entered pursuant to the provisions of Sections 3313.17, 3313.841, ~~3313.842, 3313.91~~ and 3323.08 of the Ohio Revised Code.

**{¶74}** R.C. 3313.17 authorizes a school board of education to enter contracts.

**{¶75}** The version of R.C. 3313.841 in effect at the time of the parties' 2013-2014 Agreement, i.e., 2007 HB 119, permits an educational service center to contract for sharing teacher services for "the services of supervisory teachers, special instruction teachers, special education teachers, and other licensed personnel necessary to

19

conduct approved cooperative classes for special education and related services and gifted education."

**{¶76}** Contrary to Mentor's claims, former R.C. 3313.841 does not mandate that the educational service center is responsible for using its state and local subsidy payments based on its participating district's enrollment numbers as a credit for services to that district.

**{¶77}** Further, former R.C. 3323.08 likewise does not dictate that an educational service center must use its district member's state and local subsidies solely to offset or provide services or personnel only for those member districts.

**{¶78}** The remaining statutes referenced in the parties' 2012-2013 Agreement, i.e., ~~3313.842, 3313.91,~~ were crossed out by Mentor officials during their acceptance of the agreement, and as such, were not agreed upon terms but constituted a counterproposal by Mentor to Lake ESC. *Livi Steel, Inc. v. Bank One, Youngstown, NA*, 65 Ohio App.3d 581, 588, 584 N.E.2d 1267 (11th Dist.1989) (holding that "[I]f the acceptance modifies or alters the terms set forth in the [contract], then the acceptance is deemed a rejection and counteroffer, which must be accepted by the [other party] in order to be effective as a contract."); *Slezak v. Westfield Ins. Co.* (July 7, 1977), 8th Dist. Cuyahoga No. 35474, unreported. Thus, Lake ESC impliedly assented to Mentor's change in the terms of the contract once it acted upon the agreement without rejecting Mentor's modifications. *Eaton v. Ann-L Corp.*, 7th Dist. Columbiana No. 06 CO 53, 2007-Ohio-2759, ¶11 citing *O.F. Mehurin & Son v. Stone,* 37 Ohio St. 49, 57-58 (1881).

**{¶79}** Accordingly, neither the governing statutes nor the terms of the parties' 2013-2014 Agreement required Lake ESC, as a contracting educational service center,

to provide its participating school district with a credit in the amount of its state and local subsidies that are based on Mentor's ADM. Although Lake ESC's state and local subsidy payments were *based on* Mentor's enrollment numbers, these were not Mentor's funds. R.C. 3313.843(G). Accordingly, summary judgment was properly entered in Lake ESC's favor on Mentor's second claim for declaratory judgment.

<u>Mentor's third claim for declaratory judgment</u>

**{¶80}** Mentor's third and final count for declaratory judgment, referred to as "Regarding Defendant's Use of the FY 2015 Subsidy Payment," asked the trial court to find that Lake ESC's use of its 2015 subsidy for any reason other than directly servicing Mentor violates the express terms of the parties' agreement. This argument is likewise premised on its erroneous theory that the 2012-2013 Integrated Service Agreement is the governing contract.

**{¶81}** However, as stated previously, the parties' 2012-2013 Agreement was superseded by the subsequent Interdistrict Service Agreement, and the plain terms of the parties' 2013-2014 Agreement do not require the spending as Mentor claims. The statutes governing this 2013-2014 Agreement likewise do not dictate the outcome sought by Mentor, and as such, summary judgment in Lake ESC's favor was proper on Mentor's third claim for declaratory judgment.

**{¶82}** Mentor asserts as part of its argument that the trial court improperly relied on Lake ESC's expert report to reach legal conclusions upon assessing its second and third counts for declaratory judgment. We agree that the trial court erroneously considered the expert report of Craig Eric Burford in addressing these issues of law since the interpretation of a contract is a question of law. *Latina v. Woodpath*

21

*Development Co.*, 57 Ohio St. 3d 212, 567 N.E.2d 262 (1991). Notwithstanding the trial court's improper reliance on Lake ESC's expert report, it nonetheless reached the correct result and awarded Lake ESC summary judgment. Thus, the error was harmless. *Bangor v. Amato*, 7th Dist. Columbiana No. 14CO9, 2014-Ohio-5503, 25 N.E.3d 386, ¶34; *Knor v. Parking Co. of Am.*, 73 Ohio App. 3d 177, 189, 596 N.E.2d 1059 (1991).

<u>Mentor's breach of contract claim</u>

**{¶83}** "In a breach of contract claim, the plaintiff must prove the existence of a contract, the plaintiff's performance under the contract, the defendant's breach, and damages." *Meeker R&D, Inc. v. Evenflo Co.*, 11th Dist. Portage Nos. 2014-P-0060, 2015-P-0017, 2016-Ohio-2688, ¶41, citing *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994).

**{¶84}** Mentor asserts that Lake ESC was in breach of their agreement in years 2014 and 2015 based on Lake ESC's failure to provide all of the mandated and agreed upon services based on the continuation of the parties' 2012-2013 Interdistrict Service Agreement. However, as previously explained, the premise for Mentor's breach claim is erroneous since their 2012-2013 Agreement was superseded upon the parties entering the subsequent Interdistrict Service Agreement.

**{¶85}** The parties did not enter a written agreement governing their rights and obligations as directed by R.C. 3313.843 for these school years. However, neither party disagrees that Mentor was aligned with Lake ESC for those years, and neither denies that Mentor received at least some educational services from Lake ESC during the 2013-2014 and 2014-2015 school years.

22

**{¶86}** Thus, in the absence of contractual or statutory language dictating how Lake ESC must spend its subsidies based on Mentor's enrollment, Lake ESC did not breach. Thus, Mentor's breach of contract claim fails as a matter of law and summary judgment was proper on this claim.

<u>Mentor's unjust enrichment claim</u>

**{¶87}** Alternatively, Mentor asserted that Lake ESC was unjustly enriched based on its retention of Mentor's 2014 and 2015 subsidy payments without providing the corresponding services to Mentor's detriment. This claim is likewise based on the erroneous premise that the express provisions of the parties' 2012-2013 Agreement and former R.C. 3313.843(G) required Lake ESC to use its Mentor-based subsidies solely to provide services or a credit for Mentor.

**{¶88}** Although a party can plead in the alternative, our finding that an express contract governs this issue precludes the application of unjust enrichment. *Champion Contr. & Constr. Co. v. Valley City Post No. 5563*, 9th Dist. Medina No. 03CA0092-M, 2004-Ohio-3406, ¶25, citing *Aultman Hosp. Ass'n. v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920 (1989).

**{¶89}** Notwithstanding, a successful claim for unjust enrichment requires the establishment of three elements. A plaintiff must establish that it conferred a benefit on the defendant, that the defendant had knowledge of the benefit, and that the defendant's retention of the benefit under the circumstances is unjust without compensation or payment. *L & H Leasing Co. v. Dutton,* 82 Ohio App.3d 528, 534, 612 N.E.2d 787 (1992); *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984). "Recovery under unjust enrichment is designed to compensate the

23

plaintiff for the benefit he has conferred upon another, *not to compensate him for a loss suffered.*" (Emphasis added.) *Jones v. Jones*, 179 Ohio App.3d 618, 2008-Ohio-6069, 903 N.E.2d 329, ¶33 (3d Dist.), quoting *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954).

**{¶90}** Lake ESC established that the state subsidies based on Mentor's alignment agreement and average daily enrollment are generally intended to support the educational service center's basic operations and pay for its statutorily mandated services. Lake ESC further established that although it terminated the parties' prior course of dealing, as agreed in their 1995 City/County Contract, it nonetheless continued to offer the requisite services required under statute. The fact that Mentor did not use the available Lake ESC services, in light of its belief that it should have received a credit toward the purchase of personnel from its subsidy money as it had in the past, does not establish that Lake ESC's enrichment was unjust.

**{¶91}** Although Lake ESC benefitted from Mentor's continued alignment with it via receipt of state and local subsidies, Mentor could have aligned with another ESC upon learning about the change in Lake ESC's business model. Thus, Lake ESC's retention of the Mentor-based state and local subsidies was not unjust.

**{¶92}** Further, Mentor subsequently aligned with the Cuyahoga County Educational Service Center ("Cuyahoga ESC"). Cuyahoga ESC superintendent, Robert Mengerink, confirmed that each Ohio school district pays a $6.50 per ADM to align with an ESC. The state pays this money directly to an ESC into its general fund. The other amount paid to ESCs, the state operating subsidy, comes from state funds directly to an

24

ESC. This amount varies annually and is budgeted from state funds. He agreed that both amounts "belong to" the ESC.

**{¶93}** Mengerink described Cuyahoga's ESC's use of the state operating subsidy stating, "90 percent of the state subsidy that [Cuyahoga ESC] receive[s,] we use to provide them [Mentor] with services * * *." However, he confirmed that Cuyahoga ESC does not have to provide Mentor with 90 percent of its state subsidy for services, stating "That's what we do, but we don't have to do it. It's our money to do as we please."

**{¶94}** Based on the foregoing, the trial court properly granted Lake ESC summary judgment as to Mentor's claim for unjust enrichment.

**{¶95}** Mentor's sole assignment of error lacks merit and the judgment of the Lake County Court of Common Pleas is affirmed.