[Cite as *Menard, Inc. v. DiPaolo Indus. Dev., L.L.C.*, 2023-Ohio-1188.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

MENARD, INC.,

        Plaintiff-Appellee,

  - vs -

DIPAOLO INDUSTRIAL
DEVELOPMENT, LLC,

        Defendant-Appellant.

**CASE NO. 2022-T-0032**

Civil Appeal from the
Court of Common Pleas

Trial Court No. 2015 CV 00169

## O P I N I O N

Decided: April 10, 2023
Judgment: Affirmed in part, reversed in part, and remanded

*Julian T. Emerson*, Reminger Co., LPA, 101 West Prospect Avenue, Suite 1400, Cleveland, OH 44115 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, DiPaolo Industrial Development, LLC, appeals the judgment of the Trumbull County Court of Common Pleas in favor of plaintiff-appellee, Menard, Inc. For the following reasons, we affirm in part and reverse in part the judgment of the lower court and remand for further proceedings consistent with this opinion.

{¶2} On January 29, 2015, Menard filed a Complaint against DiPaolo Industrial raising claims of Breach of Contract (Count I), Breach of Express Warranty (Count II), Indemnification (Count III), and Conversion (Count IV). The Complaint was based on the

following allegations: "Menard and Defendant entered into a written agreement * * * for work to be performed by DiPaolo at a new Menard's location in Warren, Ohio * * *, the scope of which included demolition, concrete-crushing, salvage, storage, and milling of asphalt services. * * * As a result of DiPaolo's failure to timely complete its work despite Menard's requests, Menard was compelled to hire another contractor to complete DiPaolo's work and correct defective and non-conforming work."

{¶3} On December 16, 2015, DiPaolo Industrial filed an Answer and Counterclaim raising claims for Breach of Contract (Count One), Unjust Enrichment (Count Two), Foreclosure of Mechanic's Lien (Count Three), and Defamation of Character (Count Four). DiPaolo asserted that it performed its obligations under the contract and Menard had failed to remit payment pursuant to its terms. Furthermore, it was alleged that "DiPaolo and Menard agreed [per change orders] to DiPaolo performing additional work on the project related to the original demolition scope of the work" and "Menard failed to timely approve and remit payment for the Change Orders."

{¶4} On October 17, 2017, the trial court granted partial summary judgment in favor of Menard on DiPaolo's claims for Breach of Contract and Unjust Enrichment with respect to the change orders only.

{¶5} On July 26 and 27, and on October 11, 2018, trial was held before a magistrate.

{¶6} On May 13, 2019, the Magistrate's Decision was issued. The magistrate found in favor of Menard with respect to both the claims of the Complaint and Counterclaim based on the following Findings of Fact:

2

1. James Carlson is the Assistant General Manager of Store Planning and Construction for Plaintiff.[1]

2. Sergio DiPaolo is the Managing Member of Defendant.

3. Plaintiff issued an October 1, 2013 "Invitation to Bid" packet of documents for potential bidders, which comprised of demolition plans, site plans, environmental report, soils report, specifications, and a sample contract.

\* \* \*

5. Defendant received and reviewed the Invitation to Bid documents before entering into contract with Plaintiff.

\* \* \*

11. The Invitation to Bid stated, "The work to be performed hereunder should be commenced and completed on or before the dates as shown in the contract. The general contractor agrees that time is of the essence and that the times stated shall only be modified by written agreement of the parties. Completion means all work including punch list item complete and all inspections complete. The contractor agrees that the owner will suffer financial loss if the project is not completed on the completion date."

\* \* \*

16. Sergio DiPaolo reviewed the contract and signed the contract on behalf of Defendant.

\* \* \*

18. The contract entered into was to be enforced in conjunction with the Invitation to Bid documents.

19. The contract was for the sum of $286,000.

\* \* \*

22. Per the contract, "Contractor shall not perform any extra or additional work or changes from the contract documents unless previously authorized in writing by an AIA change order signed by

---

1. References to the trial transcript and exhibits included in the Magistrate's Decision are omitted throughout the Findings of Fact.

Case No. 2022-T-0032

Troy Anderson, the General Manager Store Planning/Design/Construction. Portions of change order work are subject to merchandise credit check. Owner's project managers are not authorized to approve changes in the work."

23. Defendant admitted that nowhere in the contract does it state Defendant could perform additional work simply off a verbal communication go ahead.

24. Per the contract, "The work to be performed hereunder shall be commenced by November 11, 2013, and have demolition completed on or before December 27, 2013, and complete crushing by January 31, 2014 ("Agreement Period"). CONTRACTOR agrees that TIME IS OF THE ESSENCE and that the above stated dates shall not be modified unless the modification is in writing and signed by the OWNER and CONTRACTOR. Inclement weather shall not be considered as a cause for an extension of time or completion of the work."

25. Plaintiff contends that time was of the essence for completion of the work because Plaintiff intended on constructing a new Menard store once demolition was completed.

26. When Defendant returned the signed contract, he also included an "addendum" dated November 11, 2013 which purported to extend the time period for crushing the asphalt due to adverse weather conditions. The addendum was not signed by Defendant or any representative of Plaintiff. Defendant contends that because Plaintiff never informed him that the addendum was rejected that it is binding on the parties. However, Jim Carlson specifically testified that the proper protocol to change or add terms to the contract would be for Troy Anderson to agree to it and sign off on any change.

27. Per the contract, "Contractor shall indemnify and hold harmless owner, its agents and its employees from any and all liability, damages, expenses, claims, demands, actions, or cause of action, including attorney fees, arising out of the performance of the Contract Documents, Agreement and/or work hereunder, whether such liability, damages, expenses, claims, demands, actions or causes of action are caused by contractor, its subcontractors, or lower tiered contractors, or their agents or employees, owner, its agents and its employees, or any persons acting on their behalf of owner and/or contractor."

28. Defendant admitted that similar to the Invitation to Bid documents, the contract once again laid out the payment procedure,

4

which was the usual AIA payment procedure that Defendant was accustomed to from other projects.

29. Defendant received a December 17, 2013 correspondence from Plaintiff returning Defendant's first payment application because it did not properly follow the payment procedure in the contract.

30. Defendant understood Plaintiff's rationale for rejecting the first payment application and had no issues.

31. Upon remedying the issues with payment application one, Defendant resubmitted and was paid $143,590.50.

32. Defendant received a January 31, 2014 correspondence from Plaintiff that expressed concerns Plaintiff was having with Defendant's work as it pertained to the project. [Similar correspondence was received by the Defendant on April 3, April 25, May 6, and May 16.]

33. Defendant received a March 12, 2014 seven-day notice letter from Plaintiff that expressed concerns Plaintiff was having with Defendant's work as it pertained to the project, along with a list of items that still needed to be completed. [A similar seven-day notice was received by the defendant on April 8.]

34. Defendant received a March 17, 2014 correspondence from Plaintiff regarding the rejection of pay application 2.

35. Upon remedying pay application 2 in accordance with the contract, Defendant resubmitted pay application 2 and was paid $70,902.

* * *

41. Defendant admitted that it was possible the list of contractual items in the May 16, 2014 correspondence still had not been completed by Defendant.

42. Defendant received a May 22, 2014 correspondence from Plaintiff regarding back charges for the contractual work Defendant did not perform which Plaintiff paid McConnell Excavating to complete.

43. Defendant received a May 29, 2014 correspondence from Plaintiff titled "Final Notice Breach of Contract/ Abandonment of Property/ Trespass to Chattels", which stated "This serves as your

5

Case No. 2022-T-0032

final notice that DiPaolo Industrial Development has failed to fulfill its obligations under the contract and impaired Menard, Inc. in its use of its property including the certain premises located at 2057 Elm Road, Cortland, Ohio, and implements that belong to that property… Please remove construction equipment and other property left behind at the above site within five days of the date of this letter and remit the property of Menard, Inc., including the fencing that you possess. The failure to timely make these actions will result in a lawsuit against you where Menard, Inc., will seek judgment against you and avail itself of all potential remedies and recover for all available costs."

44. Defendant received a July 8, 2014 correspondence from Plaintiff rejecting pay applications 3, 4, and 5 because they did not comply with the contract.

45. Defendant attempted to bill Plaintiff for final payment despite admittedly not completing all of its contractual work. [In total, Plaintiff paid Defendant two payments under the contract in the amount of $143,590.50 and $70,902, totaling $214,492.50.]

* * *

51. According to Plaintiff, Plaintiff withheld payment from Defendant because of defective work not remedied and a reasonable indication that the work would not be completed within the agreement period.

* * *

54. Plaintiff terminated the contract with Defendant because it determined that Defendant did not complete its contractual work and would not be able to complete its contractual work on time.

* * *

65. Plaintiff hired McConnell Excavating to complete Defendant's contractual work. [Plaintiff made three payments to McConnell Excavating in the amounts of $16,245, $117,944.50, and $3,215.34 for completing Defendant's contractual work.]

* * *

74. Plaintiff back charged Defendant total amounts of $17,869.50, $129,738.95, and $3,536.87, which included the three payments made to McConnell Excavating and the contractual 10% administrative fee.

6

Case No. 2022-T-0032

\* \* \*

75. Defendant admitted that it did not leave the site and remove all of its machinery until mid-May to early June 2014.

76. Defendant admitted that it did not complete all its contractual work and went through various items that were not completed.

77. Defendant removed fencing from the demolition project without permission.

78. Plaintiff made repeated requests that Defendant return the fencing.

79. Defendant admitted that it never returned the fencing or reimbursed Plaintiff for the fencing it took.

80. Defendant admitted that it never informed Plaintiff of the location of the fence to enable Plaintiff to retrieve the fence.

81. Defendant admitted that it no longer has control of the facility where the fencing is currently stored.

82. The replacement value of the fencing is approximately $25,000.

\* \* \*

85. No evidence was presented that Plaintiff published a false statement about Defendant.

{¶7} On October 7, 2019, a second Magistrate's Decision was issued awarding damages. Menard was awarded a total of $274,379.88, representing $69,357.82 for contractual or construction damages[2], $25,000 for conversion, and $180,022.06 for attorney fees.

---

2. This figure was based on the original contractual price of $286,000 plus $8,000 for additional work performed by DiPaolo for a total contract price of $294,000. From this figure was subtracted the $214,492.50 Menard paid to DiPaolo and $148,865.32 in back charges as a result of hiring McConnell Excavating to complete the contractual work.

Case No. 2022-T-0032

{¶8} On March 21, 2022, after hearing DiPaolo Industrial's objections to the Magistrate's Decisions, the trial court adopted both Decisions.

{¶9} On April 19, 2022, DiPaolo Industrial filed a Notice of Appeal. On appeal, DiPaolo Industrial raises the following assignments of error:

> [1.] The trial court [erred] by granting partial summary judgment to plaintiff on defendant's counterclaims.
>
> [2.] The trial court's decision that defendant breached its contract with plaintiff is not supported by the weight of the evidence and is contrary to Ohio law.
>
> [3.] The trial court's findings that defendant removed salvaged fencing from the jobsite without permission to do so and that plaintiff was damaged in the sum of $25,000 are not supported by [the] manifest weight of the evidence.
>
> [4.] The trial court erred as a matter of law by awarding counsel fees to plaintiff.
>
> [5.] The trial court's determination that defendant had produced no evidence indicating that plaintiff published a false and defamatory statement regarding defendant is not supported by the manifest weight of the evidence.

{¶10} In the first assignment of error, DiPaolo argues the trial court erred by granting partial summary judgment with respect to its counterclaims for Breach of Contract and Unjust Enrichment.

{¶11} Summary judgment is appropriate when "there is no genuine issue as to any material fact and * * * the moving party is entitled to judgment as a matter of law," i.e., when "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

8

Civ.R. 56(C). An appellate court's "review of a summary-judgment ruling is de novo." *Fradette v. Gold*, 157 Ohio St.3d 13, 2019-Ohio-1959, 131 N.E.3d 12, ¶ 6.

{¶12} In the course of the parties' dealings with each other, DiPaolo Industrial submitted eight Change Orders to Menard for additional work not contemplated by the original Construction Contract. This Contract provided as follows with respect to additional work:

> **ARTICLE 2: CHANGES IN THE WORK –**
>
> OWNER [Menard], without invalidating this contract, may, at any time, order changes in the work within the general scope of this contract. **CONTRACTOR** [DiPaolo] **shall not perform any extra or additional work or changes from the Contract Documents unless previously authorized in writing by an AIA change order signed by Troy Anderson, the General Manager Store Planning/Design /Construction. Portions of change order work are subject to merchandise credit check.** OWNER's project managers are not authorized to approve changes in the work.

{¶13} With respect to such contractual provisions, the Ohio Supreme Court has held: "It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefore in compliance with the terms of the contract, unless waived by the owner or employer." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 360, 678 N.E.2d 519 (1997). Under the first assignment of error, DiPaolo asserts "the question presented is whether or not material questions of fact exist as to Menard's waiver of the change order procedures contained in the original contract between the parties." Assignments of Error and Brief of Appellant, at 17.

9

Case No. 2022-T-0032

{¶14} With respect to waiver of such contractual provisions, the Ohio Supreme Court has held: "It is familiar law that stipulations in written contracts may be waived by the parties, and that a construction placed by the parties upon a written contract in the progress of its performance, with full knowledge of all the circumstances, will be binding. * * * This rule is peculiarly just when applied to building contracts, when changes are made, the necessity for which develops as the work progresses, and while the parties are intent on the accomplishment of the undertaking, no fraud or undue advantage being shown." *Expanded Metal Fireproofing Co. v. Noel Constr. Co.*, 87 Ohio St. 428, 440, 101 N.E. 348 (1913).

{¶15} This court has similarly held: "'A provision in a construction contract that change orders be reduced to writing and signed by the parties may be waived. The requirement will be considered to have been waived by the parties when there is clear and convincing evidence showing that the alterations were made with the knowledge and *participation* of all concerned, no fraud having been shown.'" (Emphasis added.) *Wells Fargo Bank, N.A. v. Smith*, 11th Dist. Trumbull No. 2010-T-0051, 2012-Ohio-1672, ¶ 42, citing *Frantz v. Van Gunten*, 36 Ohio App.3d 96, 521 N.E.2d 506, syllabus (3d Dist.1987). This court explained, "[b]y requiring evidence as to subsequent acts of the 'opposing' party, a proper balance is reached between the enforcement of the basic purpose of the clause and the concern that a party could agree to both the oral waiver and modification, and then 'hide' behind the 'no oral modification' clause in order to avoid enforcement." *Id.* at ¶ 46; *Foster* at 364 ("mere knowledge, and even acquiescence, is not enough for recovery"). *Compare* 2A *Bruner & O'Connor on Construction Law*, Waiver of written change order requirements, Section 7:250 ("Many construction contracts require that in

10

order for a contractor to be entitled to compensation for performing extra work, the work must first be authorized by a written change order. The intent behind these provisions is to protect the owner from surprise claims for extra work. To this extent, these provisions fulfill a legitimate and useful purpose. Nevertheless, these provisions have been employed to shield an owner from having to pay a contractor for work that was clearly beyond the scope of the contract. This is an area where the courts often employ equity in the form of finding that the written authorization requirement was waived by the party seeking to enforce its terms.").

{¶16} DiPaolo Industrial's managing member, Sergio DiPaolo, testified by deposition that change orders were approved verbally by either Menard's project manager, Brad Wondra, or assistant general manager, Jim Carlson. DiPaolo testified that generally the terms for the additional work were negotiated with either Wondra or Carlson and then a written change order would be submitted by DiPaolo Industrial for signature by general manager, Troy Anderson. However, only one of the eight change orders was ever signed.

{¶17} The first change order involved additional grading or clearing an area on the south side of the construction site for the installation of a gas line. A November 18, 2013 email from Wondra to DiPaolo stated: "Can you get me a price on that grading * * * by Friday? I need to get this work done so utilities can come in to relocate the gas line toward the property line." DiPaolo testified regarding the negotiations with Wondra: "We spoke about it. He asked me about it, it had to be done, give me a price. I gave him a price. And then he responded back, sounds good, okay, we're good to go on that." A December 9, 2013 email from Wondra to DiPaolo stated: "Jim [Carlson] gave me the go ahead on

11

the extra work on the south side of the property ($6,000). Go ahead and start mobilizing." Carlson, in his deposition, affirmed that he spoke with Anderson about the additional work and that DiPaolo Industrial was authorized to do the work. DiPaolo Industrial did not submit a written change order until March 25, 2014, and Anderson did not sign the order until April 18, 2014. According to the terms of the Construction Contract, DiPaolo Industrial should not have been authorized to commence the work until Anderson had signed the change order.

{¶18} The second change order involved the removal of a pylon sign. DiPaolo testified that Wondra verbally approved this change order. Carlson testified that "the cost [to remove the sign] was approved by Troy Anderson to go ahead with that." DiPaolo claimed a change order was submitted but never returned.

{¶19} On April 10, 2014, Wondra emailed DiPaolo and copied both Carlson and Anderson: "On December 9th, we approved change order #1 for the regrading over on the south side of the property. I will submit to Troy to sign. On the AIA change order form #2, I do not know what this all entails. Why is it going to cost me [an] additional $6,000 to remove[] the other pylon sign. Please advise. Work Order-Excavation [third change order]- We will not sign. Per the contract plans, you were supposed to remove the utilities and backfill your trenches properly. Work Order-Asphalt [fourth change order]- We are not opposed to this as an extra for the asphalt. In the existing parking lot, there is a total of 7" of asphalt that needs to be milled. However, we will not agree to a change order on a per day basis. We will only agree on a fixed cost."

{¶20} The foregoing evidence is sufficient to raise a genuine issue of material fact as to whether Menard waived the contractual provision that additional work had to be

12

approved by Anderson in writing prior to the commencement of the work. Such was not the procedure followed by either of the parties in the course of performance of the contract. It is noted that the contract specifically stated that project managers could not approve changes in the work. *See Foster*, 78 Ohio St.3d at 364, 678 N.E.2d 519 ("[i]t is generally recognized that, in the absence of an express authority, an engineer, architect, superintendent or inspector in charge of or assigned to public building or construction work has no power to waive or modify a stipulation requiring a written order for alterations, even where that person may authorize alterations in writing"). However, the evidence in the present case is that Wondra would consult with Carlson, an assistant general manager, before conveying approval to DiPaolo Industrial. Moreover, Carlson would consult with Anderson regarding the change orders, and Anderson was the Menard representative with authority to approve change orders. The significant point is that all levels of Menard's management were actively aware of and/or participating in the authorization of additional work contrary to the terms of Article 2. In these circumstances, summary judgment on the issue of waiver was not appropriate as to any of the purported change orders to which DiPaolo claims Menard agreed.[3]

{¶21} We emphasize that there is evidence from which it could be reasonably inferred that Anderson was being consulted about change orders and giving his approval without regard for the contractual procedure. Giving DiPaolo the benefit of such inferences, Anderson approved the first two change orders through Carlson without

---

3. We are aware that, in the final judgment after trial, the contract price was adjusted to incorporate the cost of some of the additional work performed by DiPaolo Industrial. We are also aware that whether Menard ever agreed to the terms of the change orders and whether DiPaolo Industrial completed the work proposed in the change orders are also in dispute. Our ruling here is limited to whether the issue of waiver could be decided as a matter of law.

13

Case No. 2022-T-0032

requiring a written AIA change order. Nor does the evidence substantiate the claim that Menard merely "acquiesce[d]" to DiPaolo's performance of additional work. In the case of the first change order, Menard approached DiPaolo and requested "a price" for additional grading. The price for the second change order was approved by Anderson and accepted by DiPaolo, although Wondra appears to have been unaware of the agreement. In almost every case, Menard was active in negotiating the terms and compensation for the performance of additional work. If Anderson was approving the additional work without requiring written change orders (at least until DiPaolo requested payment), a genuine issue of material fact exists on the waiver issue and summary judgment should have been denied.

{¶22} DiPaolo Industrial also argues the lower court erred by granting summary judgment on its unjust enrichment claims on the grounds that "each change work order is a contract in and of itself." Assignments of Error and Brief of Appellant, at 20-21. We disagree. Regardless of whether a change order contains the elements of a separate contract, the *subject* of additional work is one that is encompassed by the original contract. *See* Conditions of the Contract / Instructions to Bidders, Change Order Procedure 5.A ("[t]he change order shall clearly state the original contract amount, revised contract amount and any extension or reduction in the schedule").

{¶23} "Generally, Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter." *Bunta v. Superior VacuPress, L.L.C.*, __ Ohio St.3d __, 2022-Ohio-4363, __ N.E.3d __, ¶ 36; *Jochum v. Howard Hanna Co.*, 11th Dist. Lake No. 2020-L-077, 2020-Ohio-6676, ¶ 45. "The doctrine of unjust enrichment is limited when an express contract exists that concerns the

14

same subject because "'the parties have fixed their contractual relationship in an express contract,'" and thus, "'there is no reason or necessity for the law to supply an implied contractual relationship between them.'" (Citation omitted.) *Bunta* at ¶ 39.

{¶24} To the extent indicated above, the first assignment of error is with merit.

{¶25} DiPaolo Industrial's second, third and fifth assignments of error challenge various aspects of the lower court's judgment as being contrary to the weight of the evidence.

{¶26} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶27} "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-

15

2179, 972 N.E.2d 517, ¶ 21.

{¶28} In the second assignment of error, DiPaolo Industrial disputes the finding that it was in breach of the Construction Contract for defective work and for not completing its work within the agreed period. Underlying DiPaolo Industrial's claims is the further alleged error that the trial court failed to give effect to the addendum submitted by DiPaolo Industrial with the signed Contract. The Contract itself provided that the Agreement Period for completing the work was between November 11, 2013, and January 31, 2014, and that time was of the essence. The addendum provided that "we [the parties] had both agreed to leave the Asphalt in place until the weather breaks in late February or early March," and "[c]rushing of concrete will commence during January, although if the temperature falls below 20 degrees Fahrenheit the process will stop." According to DiPaolo Industrial, "[w]ith the Addendum in effect, there was simply no firm date by which the crushing part of the operation had to be completed. * * * While Plaintiff may have alleged that the opening of its store was delayed, * * * Plaintiff's own witness testified that the store opened on time and other evidence indicated that, if any undue delay did occur, it was the fault of Plaintiff's general contractor [McConnell Excavating] rather than Defendant. Consequently, Plaintiff had absolutely no right to discontinue payments to Defendant and Defendant had every right to stop working." Assignments of Error and Brief of Appellant, at 23-24.

{¶29} The evidence is equivocal as to whether the addendum became part of the parties' Contract. When the Contract was submitted to DiPaolo Industrial, it had already been signed by Menard. DiPaolo signed and returned the Contract but included the unsigned addendum with the Contract. The signed Contract does not indicate the

16

existence of any amendments or addendum. Carlson denies that Menard agreed to the terms of the addendum. DiPaolo contends that the terms of the addendum were agreed to prior to the signing of the Contract. Given these circumstances, the addendum could be construed either as a conditional acceptance of the Contract or as a proposed amendment thereto. As a conditional acceptance, it could be argued that Menard implicitly accepted the terms of the addendum by proceeding to have DiPaolo Industrial commence demolition. As a proposed amendment, the addendum failed to adhere to the procedures set forth in the Contract for amendment or to receive any recognition by Menard.

{¶30} It is generally recognized that, "[i]n accordance with general contract principles, if the acceptance modifies or alters the terms set forth in the application, then the acceptance is deemed a rejection and counteroffer, which must be accepted by the applicant in order to be effective as a contract." (Citation omitted.) *Livi Steel, Inc. v. Bank One, Youngstown, N.A.*, 65 Ohio App.3d 581, 588, 584 N.E.2d 1267 (11th Dist.1989); *Mentor Exempted Village School Dist. Bd. of Edn. v. Lake Cty. Edn. Serv. Ctr. Governing Bd.*, 2016-Ohio-7649, 74 N.E.3d 706, ¶ 78 (11th Dist.). Conversely, under the parol evidence rule, "a party who has entered into a written contract [is prohibited] from contradicting the terms of the contract with evidence of alleged or actual agreements." (Citation omitted.) *Williams v. Spitzer Autoworld Canton, L.L.C.*, 122 Ohio St.3d 546, 2009-Ohio-3554, 913 N.E.2d 410, ¶ 14. Moreover, it is not entirely certain if the addendum was understood in the technical sense of "a thing that is added or to be added," i.e., additional terms added to the original contract, or as an amendment of the original contract. *Gutierrez-Gordillo v. Tomo Hibachi Restaurant and Lounge, L.L.C.*, 2018-Ohio-

17

2941, 118 N.E.3d 301, ¶ 11 (8th Dist.) ("[a]lthough 'addendum' and 'amendment' are legal terms of art, the parties did not give any indication that they intended that an 'addendum' to the operating agreement would not be the same as an 'amendment'").

{¶31} This issue, however, need not be determined by this Court. The evidence of record supports the finding that DiPaolo Industrial failed to complete its work under the Contract before quitting the worksite in early May, and thus substantiates the breach by DiPaolo Industrial regardless of whether the addendum is given effect.

{¶32} On the date that work was to be completed under the terms of the Contract, January 31, Menard sent a letter to DiPaolo Industrial stating the following: "This letter is to inform DiPaolo Industrial Development of the concerns Menard, Inc. has with the demolition of the old Wal-Mart building at 2057 Elm Road. * * * You are understaffed on this demolition project. I understand that we have been shut down for a week due to the extreme cold weather but there was no ambition to get caught up once the weather broke. When I was onsite on January 30th, it was 30 degrees out and only 2 people were working on pulverizing the concrete slabs. No one was working on disassembling the Garden Center, removing the parking lot light fixtures, or removing underground utilities. Please forward me an updated schedule and how you are going to get caught back up, to be finished no later than March 1st." At trial, DiPaolo testified that he had no issues with the content of this letter.

{¶33} On March 12, 2014, Menard sent a "7-day notice" to DiPaolo Industrial detailing items which have been completed and advising that "[t]hese items must be 100% completed otherwise Menard, Inc. will be forced to bring in another contractor at your expense."

18

{¶34} On April 3, 2014, Menard advised DiPaolo Industrial that the general contractor "will start mobilizing for the new store starting Monday, April 7th," and "[y]ou must have all work completed and your material and equipment out next week." Corey Frasier, the general superintendent for McConnell Excavating, testified at trial that McConnell Excavating began work on site in the first week of April 2014. Frasier also testified to work completed by McConnell Excavating that was left undone by DiPaolo Industrial. DiPaolo complained that the presence of McConnell Excavating on site, in addition to the way in which McConnell Excavating performed demolition work, delayed and hindered DiPaolo Industrial from completing its own contract work. However, under the terms of the addendum, at this point DiPaolo had had a full month to complete its work which should have consisted of removing asphalt and crushing concrete.

{¶35} DiPaolo testified at trial that DiPaolo Industrial quit the worksite in the first week of May because he did not believe Menard would pay him anything further and returned during the next two to three weeks to remove equipment. At the time DiPaolo Industrial quit the work site, DiPaolo acknowledged that there was work under the Contract that had not been completed, although the extent of that work was disputed.

{¶36} Given the foregoing record, we conclude that the finding that DiPaolo Industrial was in breach is supported by the weight of the evidence regardless of whether the addendum was in effect. Two months from early March, when according to the addendum any work that was suspended on account of cold weather should have recommenced, was a reasonable period of time for DiPaolo Industrial to complete its work. Whether the new store opened on schedule is not material to the issue of breach, as the record demonstrates DiPaolo Industrial needed to complete its work so that the

19

general contractor could begin its work.

{¶37} The second assignment of error is without merit.

{¶38} In the third assignment of error, DiPaolo Industrial argues that the finding of conversion with respect to the fencing was against the weight of the evidence.

{¶39} According to the terms of the Contract, certain items from the demolition project, including wrought-iron fencing at issue herein, were reserved by Menard as salvage. DiPaolo Industrial stored the fencing offsite until a time at which it was agreed that Menard would collect the fencing and other salvaged material. DiPaolo Industrial returned the items to the work site, but Menard did not provide enough transportation to remove it. Therefore, DiPaolo Industrial returned it to storage at 408 Dana Street. Carlson testified that Menard repeatedly asked for the fencing to be returned and was willing to pick up the fencing but did not know where it was being stored. Carlson estimated the value of the fencing at $25,000. DiPaolo testified that he would not return the fencing unless Menard agreed to pay for the cost of transportation. DiPaolo admitted that he did not inform Menard of where the fencing was located and that the building where it is located is no longer under DiPaolo Industrial's control.

{¶40} Conversion is defined as "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990).

> Conversion * * * requires nothing more than the defendant possessing a plaintiff's chattel and being unwilling to give it back. See Keeton, Prosser & Keeton on Torts (1984), 88 *et seq.* Sec. 15-Conversion. There is no requirement that the personal property be wrongfully obtained. Although a demand and refusal to return the personal property is ordinarily necessary to prove conversion, acts

20

by a defendant which are inconsistent with the right of a plaintiff's ownership are sufficient to satisfy this requirement.

*Kiss v. Dick Baker Dodge*, 6th Dist. Erie No. E-98-027, 1998 WL 904920, *3; *Baltimore & Ohio RR. Co. v. O'Donnell*, 49 Ohio St. 489, 32 N.E. 476 (1892), paragraph two of the syllabus ("[a]ny wrongful exercise of dominion over chattels in exclusion of the rights of the owner, or withholding of them from his possession under a claim inconsistent with his rights, constitutes a conversion").

{¶41} We find that the evidence of record supports a finding of conversion. There was evidence that DiPaolo wrongfully refused to return the fencing to Menard and/or enable Menard to reclaim it when asked by Menard. Moreover, Carlson, as assistant general manager of the project, was competent to provide an estimate of the value of the fencing (of course, not being able to access the fencing, its value could not be properly appraised). *Compare Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 627, 605 N.E.2d 936 (1992) ("[w]e know of no reason for withholding information from a jury's consideration or for requiring a corporate officer to qualify as an expert in all cases before testifying as to the value of corporate property").

{¶42} The third assignment of error is without merit.

{¶43} In the fifth assignment of error, DiPaolo Industrial argues that the judgment in favor of Menard as to its counterclaim for defamation is against the weight of the evidence.

{¶44} At trial, DiPaolo testified that he viewed a news segment on 27 WKBN in which a spokesperson for Menard was "talking about this lawsuit * * * and that Mr. DiPaolo had stolen fencing and other items from the property." After contacting the news station, it was learned that the video of the segment was no longer available. DiPaolo Industrial

21

introduced a couple of print articles regarding the lawsuit which included the allegation that DiPaolo Industrial had unlawfully removed $25,000 in fencing belonging to Menard. Additionally, DiPaolo testified that Wondra filed a complaint with law enforcement regarding the fencing and that he was questioned by the police about the fencing. DiPaolo Industrial contends the foregoing "supports the proposition that Plaintiff was alleging that Defendant had actually stolen materials." Assignments of Error and Brief of Appellant, at 29.

{¶45} "In Ohio, defamation occurs when a publication contains a false statement 'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'" (Citation omitted.) *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77. "To establish defamation, the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." (Citation omitted.) *Id.*

{¶46} Menard counters, and we agree, that the allegedly defamatory statements fall under the scope of absolute privilege which provides that "a claim alleging that a defamatory statement was made in a written pleading does not state a cause of action where the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears." *Surace v. Wuliger*, 25 Ohio St.3d 229, 233, 495 N.E.2d 939 (1986). The allegedly defamatory statement published in the news articles related to

22

the pending litigation and so falls within the scope of the privilege. *Am. Chem. Soc.* at ¶ 86 ("[c]onsidering the article as a whole and the fact that the article contained a true and accurate summary of the legal proceedings at the time, we hold that the statements in the article are, as a matter of law, not defamatory"). Whatever statements Wondra may have made to law enforcement would be similarly protected. *Fisher v. Ahmed*, 2020-Ohio-1196, 153 N.E.3d 612, ¶ 40 (9th Dist.) ("[a]s a matter of public policy, an absolute privilege protects statements that report a possible crime, because a privilege under such circumstances encourages '"the reporting of criminal activity by removing any threat of reprisal in the form of civil liability"'") (citation omitted).

**{¶47}** The fifth assignment of error is without merit.

**{¶48}** In the fourth assignment of error, DiPaolo Industrial asserts that the award of attorney fees is in error as "Plaintiff has provided insufficient proof of these damages and, further, an award of such would be against Ohio public policy." Assignments of Error and Brief of Appellant, at 25.

**{¶49}** "Ohio has long adhered to the 'American rule' with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7. "However, there are exceptions to this rule." *Id.* "Exceptions to the rule allow fee-shifting and taxing attorney fees as costs (1) if there has been a finding of bad faith; (2) if a statute expressly provides that the prevailing party may recover attorney fees; and (3) if the parties' contract provides for fee-shifting." (Emphasis added.) *J.B.H. Properties, Inc. v. N.E.S. Corp.*, 11th Dist. Lake No. 2007-L-024, 2007-Ohio-7116, ¶ 8.

23

Case No. 2022-T-0032

**{¶50}** The parties' Contract herein provides:

### ARTICLE 5: INDEMNIFICATION

[1] CONTRACTOR [DiPaolo Industrial] shall indemnify and hold harmless OWNER [Menard], its agents and its employees from any and all liability, damages, expenses, claims, demands, actions or causes of action, including attorney fees, arising out of the performance of the Contract Documents, Agreement and/or Work hereunder, whether such liability, damages, expenses, claims, demands, actions or causes of action are caused by CONTRACTOR, its subcontractors, or lower tiered contractors, or their agents or employees, OWNER, its agents and its employees, or any persons acting on behalf of OWNER and/or CONTRACTOR. [2] In the event of failure by CONTRACTOR to defend OWNER against any such claim upon ten (10) days written notification of OWNER requesting that CONTRACTOR do so, OWNER shall be entitled to directly settle any such claim. [3] CONTRACTOR waives any right to dispute the amount of any settlements made by OWNER under this provision and acknowledges that OWNER is entitled to deduct the full amount of any such settlements from the Contract Sum as defined below. [4] If Final Payment, as defined herein, has already been made by OWNER to CONTRACTOR, CONTRACTOR agrees to reimburse OWNER the full amount of any settlement within ten (10) days after receipt of invoice from OWNER.

(Emphasis added.)

**{¶51}** The issue is whether Article 5 is a fee shifting provision and, if so, under what circumstances.

**{¶52}** In contract cases in which the parties intend a fee-shift when they are involved in litigation over contract performance, we typically see the following type of language: "indemnification from and against claims, damages, losses and expenses, including but not limited to its actual attorney fees incurred, arising out of or resulting from performance of the contract or out of the actual or alleged failure of the contractor or subcontractor to perform any obligations under the contract or subcontract documents."

**{¶53}** By contrast, "[i]ndemnity arises from contract, either express or implied, and

24

is the right of a person who has been compelled to pay what another should have paid, to require complete reimbursement." *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240, 513 N.E.2d 253 (1987). "Indemnity agreements are interpreted in the same manner as other contracts." *Ferguson v. Boron*, 2018-Ohio-69, 105 N.E.3d 424, ¶ 47 (7th Dist.). "The true nature of an indemnity relationship is determined by the intent of the parties expressed within the language of the agreement." *Id.* "[A]ll the words used [must] be taken in their ordinary and popular sense," *Glaspell v. Ohio Edison Co.*, 29 Ohio St.3d 44, 47, 505 N.E.2d 264 (1987), and "[w]hen a [writing] is worded in clear and precise terms; when its meaning is evident, and tends to no absurd conclusion, there can be no reason for refusing to admit the meaning which such [writing] naturally presents." *Lawler v. Burt*, 7 Ohio St. 340, 350 (1857).

{¶54} Further, "parties 'have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced.' *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 36, 514 N.E.2d 702 (1987)[.] * * * To that end, parties to a contract may include contractual terms that abrogate the common law. *Paul Cheatham I.R.A. v. Huntington Natl. Bank*, 157 Ohio St.3d 358, 2019-Ohio-3342, 137 N.E.3d 45, ¶ 30. '[B]ut the intent to do so must be clearly indicated.' *Id.* This principle applies to contractual indemnification agreements. * * * [T]he 'nature of an indemnity relationship is determined by the intent of the parties as expressed by the language used' in the agreement. *Worth*[, supra, at] 240 * * *. [A court] cannot ascertain the parties' intent without looking at the words that they used to express their intent. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987) ('The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement')."

25

Case No. 2022-T-0032

*Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 164 Ohio St.3d 480, 2020-Ohio-6821, 173 N.E.3d 1156, ¶ 14.

**{¶55}** When read as a whole and in context, Article 5 provides for third-party indemnification only. It is not an indemnification clause for attorney fees incurred in enforcing the contract between the two contracting parties. The first sentence is unambiguously written to require DiPaolo to indemnify and hold Menard harmless from "liability, damages, expenses, claims, demands, actions or causes of action, including attorney fees, arising out of the performance of the Contract Documents, Agreement and/or Work" regardless of who caused the claim to arise, even including Menard. The first sentence must be read in context with the balance of the article. For instance, the second sentence describes what Menard may do in the event DiPaolo fails to "defend" Menard against "any such claim"—the list stated in sentence one—Menard may directly settle the claim. The third sentence provides that DiPaolo waives the right to contest the amount of the settlement and that Menard may deduct the amount from the total contract sum. The fourth sentence allows a claw-back of the settlement amount in the event final payment has been made to DiPaolo.

**{¶56}** Ohio case law does not provide an interpretation of the precise language drafted by Menard; however, cases in other states do. The critical term in Article 5 is "defend," which indicates the clause's application to third party claims. This term would have no effect in a direct action between the parties. "Obviously, in a direct action between the parties, neither party would be interested in tendering its defense or being defended by the other party." *Canopy Corp. v. Symantec Corp.*, 395 F.Supp.2d 1103, 1115 (D.Utah 2005).

26

{¶57} Further, "[c]onstruing the indemnification clause 'as pertaining only to third-party suits affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.'" *Id.* at 1116, quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 200 (2d Cir.2003) (holding that an indemnification clause was confined to third-party claims and did not permit an attorney fee award in a first-party lawsuit); *accord Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 548 N.E.2d 903 (1989) ("To extend the indemnification clause to require defendant to reimburse plaintiff for attorney's fees in the breach of contract action against defendant would render these provisions meaningless because the requirement of notice and assumption of the defense has no logical application to a suit between the parties.").

{¶58} Based on the express language of Article 5 and the inapplicability of any other section of the contract that references attorney fees, there is no need to consider DiPaolo's public policy or evidentiary arguments.

{¶59} The fourth assignment of error is with merit.

{¶60} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas is affirmed in part and reversed in part. This matter is remanded for further proceedings consistent with this opinion. Costs to be taxed between the parties equally.


JOHN J. EKLUND, P.J., concurs,

MARY JANE TRAPP, J., concurs in part and dissents in part with a Concurring/Dissenting Opinion.

_____

27

MARY JANE TRAPP, J., concurs in part and dissents in part with a Concurring/Dissenting Opinion.

{¶61} I concur with the majority's analysis and disposition regarding DiPaolo's second through fifth assignments of error as well as the unjust enrichment portion of DiPaolo's first assignment of error. I depart ways with the majority on the breach of contract portion of DiPaolo's first assignment of error. Specifically, I disagree with the majority's determination that the record on summary judgment creates a genuine issue of material fact as to whether Menard waived the written change order requirement in the parties' contract.

{¶62} The majority correctly begins its analysis with the Supreme Court of Ohio's decision in *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 678 N.E.2d 519 (1997), which states:

{¶63} "It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor in compliance with the terms of the contract, unless waived by the owner or employer." *Id.* at 360-361.

{¶64} The rationale for this principle is as true today as it was over 125 years ago when the Supreme Court of Ohio decided *Ashley v. Henahan*, 56 Ohio St. 559, 47 N.E. 573 (1897):

{¶65} "The primary purpose of requiring written authorization for alterations in a building or construction contract is to protect the owner against unjust and exorbitant

28

claims for compensation for extra work. It is generally regarded as one of the most effective methods of protection because such clauses limit the source and means of introducing additional work into the project at hand. It allows the owner to investigate the validity of a claim when evidence is still available and to consider early on alternative methods of construction that may prove to be more economically viable. It protects against runaway projects and is, in the final analysis, a necessary adjunct to fiscal planning." *Foster Wheeler* at 363-364, citing *Ashley* at 572-573.

{¶66} In this case, Article 2 of the parties' contract, entitled "Changes in the Work," provides as follows:

{¶67} "[Menard], without invalidating this contract, may, at any time, order changes in the work within the general scope of this contract. **[DiPaolo] shall not perform any extra or additional work or changes from the Contract Documents unless previously authorized in writing by an AIA change order signed by Troy Anderson, the General Manager Store Planning/Design/Construction. Portions of change order work are subject to merchandise credit check.** [Menard]'s project managers are not authorized to approve changes in the work." [Bolding sic.]

{¶68} Thus, pursuant to Article 2, Troy Anderson was the only person who could authorize additional work on Menard's behalf, and his authorization was required to be set forth in a signed and written AIA change order.

{¶69} The majority also correctly notes that an owner may waive this type of contractual provision. *See Foster Wheeler* at 360 ("unless waived by the owner"). In those situations, "'proof of a waiver must either be in writing, or by such clear and convincing evidence as to leave no reasonable doubt about it.'" *Id.* at 364, quoting *Ashley*

Case No. 2022-T-0032

at paragraph five of the syllabus. "Mere knowledge, and even acquiescence, is not enough for recovery." *Id.* In addition, "'"[e]quivocal conduct, or conduct of doubtful import, is not sufficient."'" *Id.*, quoting *Ashley* at 574, quoting *O'Keefe v. St. Francis' Church*, 59 Conn. 551, 561, 22 A. 325 (1890).

**{¶70}** In this case, there was no written waiver of Article 2. Instead, DiPaolo contends that Menard waived the written change order procedure because Jim Carlson, assistant general manager of store planning/construction, verbally approved change order nos. 2, 5, 6, and 7, and Brad Wondra, project manager, verbally approved change order nos. 3 and 4.

**{¶71}** Critically, the plain language of Article 2 explicitly notified DiPaolo that only Mr. Anderson was authorized to approve changes in the work on Menard's behalf and that Menard's project managers *were not* authorized to do so, making any approval from Mr. Carlson and Mr. Wondra legally ineffective.

**{¶72}** DiPaolo also contends that "[a]t every juncture," Mr. Carlson and Mr. Wondra informed it "that Troy Anderson was both advised of the proposed change work orders, had approved such change work orders and that copies of such would be forthcoming."

**{¶73}** The evidentiary quality material submitted on summary judgment does not support this contention. Contrary to the majority's determination, the most that can be inferred from the record is that Mr. Anderson was copied on some of the email correspondence among DiPaolo, Mr. Wondra, and Mr. Carlson regarding additional work.

**{¶74}** Further, the majority appears to presume that Mr. Anderson was authorized to waive the written change order requirement. According to the Supreme Court of Ohio,

30

Case No. 2022-T-0032

however, "[i]t is generally recognized that, in the absence of express authority, an engineer, architect, superintendent or inspector in charge of or assigned to * * * construction work has no power to waive or modify a stipulation requiring a written order for alterations, even where that person may authorize alterations in writing." *Foster Wheeler* at 364. Here, the contract identified Mr. Anderson as "the General Manager Store Planning/Design/Construction," which indicates he fit within the purview of this rule. *See id.* There was no provision granting authority to Mr. Anderson to waive the requirement for a written and signed change order. Rather, as stated, Mr. Anderson's express authority was limited to authorizing additional work set forth in a signed and written AIA change order. *See id.*

{¶75} For the foregoing reasons, the trial court's granting of summary judgment to Menard on the issue of change orders was correct as a matter of contractual interpretation and, thus, as a matter of law. Accordingly, I would overrule DiPaolo's first assignment of error in its entirety.

31