[Cite as *Rialto on Hurstbourne, L.L.C. v. US LBM Operating Co. 3009, L.L.C.*, 2026-Ohio-1179.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| RIALTO ON HURSTBOURNE, LLC, | : | APPEAL NO. C-250077 |
| | | TRIAL NO. A-2301364 |
| Plaintiff-Appellant, | : | |
| | : | |
| vs. | : | *JUDGMENT ENTRY* |
| | | |
| US LBM OPERATING CO. 3009, LLC, d.b.a. K-I LUMBER & BUILDING MATERIALS, d.b.a. KI LUMBER, | : | |
| | : | |
| and | | |
| | : | |
| KENTUCKY INDIANA LUMBER – US LBM, LLC, | : | |
| | | |
| Defendants-Appellees. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed 50% to Appellant and 50% to Appellees.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/1/2026 per order of the court.**

**By:**_____
       **Administrative Judge**

[Cite as *Rialto on Hurstbourne, L.L.C. v. US LBM Operating Co. 3009, L.L.C.*, 2026-Ohio-1179.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| RIALTO ON HURSTBOURNE, LLC, | : | APPEAL NO. C-250077 |
| | | TRIAL NO. A-2301364 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N* |
| US LBM OPERATING CO. 3009, LLC, d.b.a. K-I LUMBER & BUILDING MATERIALS, d.b.a. KI LUMBER, | : | |
| | : | |
| and | : | |
| | : | |
| KENTUCKY INDIANA LUMBER – US LBM, LLC, | : | |
| | : | |
| Defendants-Appellees. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 1, 2026

*Bricker Graydon LLP*, *John B. Pinney* and *Kellie A. Kulka*, for Plaintiff-Appellant,

*Vorys, Sater, Seymour and Pease, LLP*, *Kent A. Britt*, *David F. Hine*, and *Emily E. St. Cyr*, for Defendants-Appellees.

CROUSE, Judge.

{¶1} Plaintiff-appellant Rialto on Hurstbourne, LLC, ("Rialto") purchased ExtremeGreen, a flooring component, from defendant-appellee US LBM.[1] As part of their agreement, US LBM expressly warranted that the products it delivered would be of merchantable quality, suitable for their intended purposes, and free from design defects. But when Rialto installed the ExtremeGreen in its new luxury apartments, it began to receive complaints of excessive noise. Rialto investigated, concluded that the ExtremeGreen was to blame, and sued US LBM for breach of its warranties. The trial court denied Rialto's motion for summary judgment and granted US LBM's.

{¶2} We now reverse part of that summary judgment. After a review of the summary-judgment materials, we hold that factual disputes as to ExtremeGreen's fitness for its ordinary and intended uses precluded summary judgment on Rialto's claims for breach of the express warranties of merchantability and suitability for intended purpose. However, because there were no material disputes on Rialto's other claims, the remainder of the trial court's summary judgment is affirmed.

## I. BACKGROUND

{¶3} Rialto is the developer and owner of the Rialto Hurstbourne ("the Project"), a 268-unit apartment complex in Louisville, Kentucky. In 2018, Rialto representatives attended a tradeshow where they learned of ExtremeGreen magnesium oxide cement board, a novel component for use in floor/ceiling assemblies. After reviewing promotional material describing ExtremeGreen's sound-transmission properties and fire ratings, Rialto incorporated ExtremeGreen into the

---

[1] Rialto's operative complaint lists the two defendants in this case as "US LBM Operating Co. 3009, LLC, (d/b/a K-I Lumber & Building Materials) (d/b/a KI Lumber)" and "Kentucky Indiana Lumber—US LBM, LLC." The parties treat these entities collectively, so we do likewise. And for clarity, we refer to defendants-appellees collectively as "US LBM."

specifications and materials list for the Project, which it sent out to potential suppliers.

{¶4} US LBM was one of those suppliers. US LBM informed Rialto that it had never used or sold ExtremeGreen before. Nevertheless, US LBM located an ExtremeGreen distributor to earn the contract. Rialto then provided US LBM with a copy of the "Material Purchase Agreement" ("the Agreement"), which specified the terms of their relationship, including agreed-upon materials, quantities, and prices. The Agreement contained several express warranties:

> In addition to any other express warranties, [US LBM] warrants that the material or goods furnished pursuant to this Agreement will be: (a) free from defects in title, workmanship and material; (b) free from defects in design except to the extent that such items comply with any detailed designs provided by [Rialto]; (c) of merchantable quality and suitable for the purposes for which the material or goods are intended.

The Agreement also included an indemnification provision that required US LBM to "indemnify and hold [Rialto] harmless from actual claims, costs, proceedings, judgments, liabilities, and expenses, including without limitation, reasonable attorney fees that result from, or are related to, the claimed breach of any of [US LBM's] warranties," unless caused by Rialto's gross negligence or illegal conduct.

{¶5} The parties signed the Agreement on August 22, 2019, and the Project was completed in 2022. The vice president of the company that managed the Project averred that, after residents began to move in, the company was "quickly notified that there were significant acoustical issues within the buildings." He "began receiving inordinate numbers of noise complaints." These sound issues, he said, led to "early lease terminations, upset tenants, and large turnover rates."

{¶6} Rialto investigated and concluded that ExtremeGreen's inadequate

sound-insulation properties were to blame for the excessive noise.

{¶7} Rialto contacted US LBM, then filed a complaint in Hamilton County.[2] Its original complaint asserted claims for (1) breach of contract, (2) misrepresentation or nondisclosure resulting in property damage, and (3) breach of warranty. However, Rialto has since dismissed its misrepresentation/nondisclosure claim.

{¶8} Following discovery, US LBM moved for summary judgment on Rialto's remaining claims, arguing primarily that they were governed by the Ohio Products Liability Act ("OPLA"), that the alleged issues with ExtremeGreen were excepted from the warranty provisions in the Agreement, and that Rialto lacked evidence to prove the elements of its claims. At roughly the same time, Rialto sought partial summary judgment on the issue of US LBM's liability. After a hearing, the trial court accepted additional briefing on the scope of the Agreement's indemnification provision.

{¶9} Ultimately, the trial court granted US LBM's motion and denied Rialto's, ruling (1) that the OPLA did not govern the claims at issue here, (2) that ExtremeGreen was included in Rialto's "detailed design" and so was exempted from the contract's warranty provisions, (3) that Rialto had failed to introduce evidence that would create a dispute of material fact as to whether ExtremeGreen caused the acoustical issues, and (4) that the indemnification provision did not apply because it covered only third-party claims and losses. *Rialto on Hurstbourne, LLC v. US LBM Operating Co.*, Hamilton C.P. No. A-2301364, 2025 Ohio Misc. LEXIS 804 (Jan. 15, 2025) ("*Rialto I*").

## II. ANALYSIS

{¶10} Rialto now appeals and, in two assignments of error, challenges both

---

[2] Hamilton County was the venue required by the Agreement's choice-of-forum clause.

the trial court's denial of Rialto's motion for summary judgment and the court's entry of summary judgment for US LBM. We address these assignments together. We begin with threshold issues regarding (A) the summary-judgment standard and (B) whether the OPLA governs Rialto's claims, before turning to the merits of Rialto's summary-judgment arguments with respect to (C) its breach-of-warranty claims and (D) its claim for litigation expenses under the Agreement's indemnification provision.

## A. *Summary-Judgment Standards*

{¶11}   A court may award summary judgment under Civ.R. 56 if the moving party shows (1) "that there is no genuine issue as to any material fact," (2) "that the moving party is entitled to judgment as a matter of law," and (3) that "it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to" the nonmoving party. Civ.R. 56(C); *accord Grafton v. Ohio Edison Co.*, 1996-Ohio-336, ¶ 10.

{¶12}   This plays out in a shifting of burdens. First, a moving party must "inform[] the trial court of the basis for the party's motion and identify[] those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim." *Midland Credit Mgt., Inc. v. Naber*, 2024-Ohio-1028, ¶ 6 (1st Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Then, if the moving party clears this hurdle, the burden shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). These "specific facts" must include more than "unsupported allegations or the pleadings." *Smathers v. Glass*, 2022-Ohio-4595, ¶ 31, citing *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 26. Only if the moving party clears the first hurdle, and if the nonmoving party fails to clear the second, is summary judgment appropriate.

**{¶13}** We review a trial court's decision granting or denying summary judgment de novo. *See Smathers* at ¶ 30.

### B. Applicable Law & the OPLA

**{¶14}** As a threshold matter, US LBM contends that Rialto's claims are governed by the OPLA, R.C. 2307.71 through 2307.80. Although the trial court disagreed with this argument, *Rialto I*, 2025 Ohio Misc. LEXIS 804, at *2-3, US LBM offers it as an alternative basis on which we could affirm the trial court's judgment. We disagree.

**{¶15}** The OPLA was "intended to abrogate all common law product liability claims or causes of action" and to supplant them with a new, statutory action. R.C. 2307.71(B). By its terms, the act governs the recovery of compensatory, punitive/exemplary damages based on or in connection with "a product liability claim." R.C. 2307.72(A) and (B). A claim or cause of action qualifies as a "product liability claim," if it (1) seeks recovery from "a manufacturer or supplier," (2) seeks "compensatory damages" for harm, defined to include "death, physical injury to person, emotional distress, or physical damage to property other than the product in question," and (3) alleges that such harm "arose from" one of three causes:

(a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(b) Any warning or instruction, or lack of warning or instruction, associated with that product; [or]

(c) Any failure of that product to conform to any relevant representation or warranty.

R.C. 2307.71(A)(13); *see also* R.C. 2307.71(A)(7) (defining "harm").

**{¶16}** But "[a]ny recovery of compensatory damages for *economic loss* based

on a claim that is asserted in a civil action, other than a product liability claim, is *not subject* to [R.C. 2307.71 through 2307.79], but may occur under the common law of this state or other applicable sections of the Revised Code." (Emphasis added.) R.C. 2307.72(C). "Economic loss" and "harm" are mutually exclusive, with the former encompassing "direct, incidental, or consequential pecuniary loss, including, but not limited to, damage to the product in question, and nonphysical damage to property other than that product." R.C. 2307.71(A)(2).

{¶17} Contract claims are not categorically outside the OPLA's reach. The OPLA plainly covers some breach-of-warranty claims. *See* R.C. 2307.71(A)(13)(c). Other warranty claims, like those claiming only "economic loss," will fall outside the OPLA. *See* R.C. 2307.72(C).

{¶18} Because Rialto sought recovery only for economic loss, its breach-of-warranty claims were not governed by the OPLA. The gravamen of Rialto's complaint was that ExtremeGreen failed to conform to relevant warranties, and, as a result, tenants complained, apartments became less valuable, and Rialto was left with the bill to bring the floor/ceiling assemblies up to appropriate standards. Such lost-business, lost-value, and cost-of-replacement injuries are quintessentially "economic loss."

{¶19} The references in Rialto's complaint to "property damage" do not alter this analysis, as the OPLA does not apply to all claims for property damage. Rather, the OPLA differentiates between "*physical* damage to property other than the product," which can support a product-liability claim, and "*nonphysical* damage to property other than that product," which constitutes mere "economic loss." (Emphasis added.) *Compare* R.C. 2307.71(A)(13), *with* R.C. 2307.71(A)(2). Rialto's allegations clearly suggest that ExtremeGreen diminished the value and quality of its apartments as a whole—not that ExtremeGreen caused portions of its building to deteriorate or be

8

destroyed. Rialto's lost-value and cost-of-replacement claims thus involve only "nonphysical damage to property," which does not fall within the OPLA.

**{¶20}** The cases US LBM cites for its contrary position are inapposite, because all applied the OPLA to breach-of-warranty claims by plaintiffs who had suffered physical injury or physical damage to property. For example, in *Henderson v. Speedway, L.L.C.*, 2018-Ohio-4605, ¶ 4-5, 30 (8th Dist.), the defendant's tainted fuel had caused damage to the internal components of the plaintiff's car. And in *Parker v. Ace Hardware Corp.*, 2018-Ohio-320, ¶ 4, 35-36 (2d Dist.), the purchased product had allegedly caused an explosion that "engulfed [the plaintiff] in flames" and left him "severely burned over 90% of his body"—a clear case of "physical injury to person" if ever there was one. Likewise, in *Mitchell v. Proctor & Gamble*, 2010 U.S. Dist. LEXIS 17956, *1-2, 10-11 (S.D. Ohio Mar. 1, 2010), plaintiff asserted that his over-the-counter medication had caused physical ailments, including "diarrhea, night sweats and fever."

**{¶21}** Unlike the plaintiffs in all of these cases, Rialto seeks recovery for economic loss and nonphysical property damage. Thus, the trial court properly concluded its claims should proceed not under the OPLA, but "under the common law of this state or other applicable sections of the Revised Code." *See* R.C. 2307.72(C).

### C. Warranty Claims

**{¶22}** The gravamen of Rialto's operative complaint was that ExtremeGreen had failed to conform to one or more express warranties in the Agreement. Specifically, Rialto alleged that US LBM breached its warranties that the ExtremeGreen it delivered would be merchantable, suitable for its intended purpose, and free from defects in design. US LBM argues that Rialto has failed to substantiate these claims with evidence, that the ExtremeGreen was exempt because it was provided pursuant to Rialto's "detailed design," and that, in any event, Rialto failed to

prove damages.

**{¶23}** The warranties at issue here were created by express terms of the Agreement, not implied by law. *Compare*, *e.g.*, R.C. 1302.27 and 1302.28 [UCC 2-314 and 2-315]. The meaning of these terms is thus a matter of contract interpretation. "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 11. If a court determines that the parties intended to reduce their agreement to a writing and that the terms of that writing are unambiguous as a matter of law, then the court will "look no further than the writing itself to determine the parties' intent." *Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, 2022-Ohio-4379, ¶ 13, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246 (1978).

**{¶24}** We generally construe the plain terms of a contract consistent with "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander* at paragraph two of the syllabus. However, "when the law is the subject," or when a phrase "'is obviously transplanted from another legal source,'" then "ordinary *legal meaning* is to be expected, which often differs from common meaning." (Emphasis added.) Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, § 6, at 73 (2012), quoting Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 537 (1947); *accord Mfg. Mgt. Sys. v. Data Solutions, Inc.*, 1987 Ohio App. LEXIS 6173, *5 (11th Dist. Mar. 20, 1987) (a term used in "a technical legal sense will be so construed, unless a different intention is clearly

expressed" (Cleaned up.)).[3]

**{¶25}** We address first (1) the Agreement's warranties of merchantability and suitability for intended purpose, and (2) the warranty against defects in design, before turning to (3) the detailed-design exception and (4) Rialto's proof of damages.

### 1. *Warranties of Merchantability & Suitability*

#### a. Meaning

**{¶26}** Clause (c) of the warranty provision states that US LBM "warrants that the material or goods furnished pursuant to this Agreement will be . . . of merchantable quality and suitable for the purposes for which the material or goods are intended." Both "merchantable quality" and "suitable for the purposes . . . intended" are terms with well-worn legal significance. We therefore begin with their legal meanings.

**{¶27}** The law deems goods to be of "merchantable quality" if they "are fit for sale in the usual course of trade at the usual selling prices." *Black's Law Dictionary* (11th Ed. 2019). Thus, for over a century, an "implied warranty of merchantability" has meant a "merchant seller's warranty—implied by law—that the thing sold is fit for its ordinary purposes." *Id.* The UCC codifies this "implied warranty of merchantability." *See* R.C. 1302.27 [UCC 2-314]. While the UCC's implied warranty does not control the meaning of the express warranty in the party's Agreement, it supplies a widely accepted baseline to help define "merchantable quality." For a good to be "merchantable" under the UCC, it must, inter alia, "pass without objection in the trade under the contract description," be "fit for the ordinary purposes for which such goods are used," and "conform to the promises or affirmations of fact made on the container

---

[3] *See also*, *e.g.*, *Thomas v. Matthews*, 94 Ohio St. 32, 56 (1916) (contractual provision regarding "net earnings" must "necessarily be given the same construction as uniformly given it by the courts in defining these terms"); *Complete Gen. Constr. Co. v. Koker Drilling Co.*, 2002-Ohio-4778, ¶ 27 (10th Dist.) (interpreting contract's use of "negligent" and "willful" in light of their use as "legal terms of art that refer to tortious conduct").

or label if any." R.C. 1302.27(B)(1), (3), (6) [UCC 2-314(2)(a), (c), (f)].

{¶28} Although it uses less-unusual language, the Agreement's warranty that goods will be "suitable for the purposes for which [they] are intended," likewise brings with it an established legal meaning. Goods are deemed "suitable" if they are "fit and appropriate for their intended purpose." *Black's Law Dictionary* (11th Ed. 2019). The use of "intended purpose" in both the Agreement and the legal-dictionary definition further evokes the "warranty of fitness for a particular purpose," which *Black's* defines as a "warranty—imposed by law if the seller has reason to know of the buyer's special purposes for the item—that the item is suitable for those purposes." *Id.* This is essentially the definition the UCC provides for the same warranty. *See* R.C. 1302.28 [UCC 2-315].

{¶29} Although the UCC's implied warranty of fitness provides a helpful baseline, it differs from the warranty here in a crucial respect. The UCC's implied warranty arises only when "the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Id.* However, because the warranty at issue here was given expressly with respect to all goods to be furnished under the Agreement, no such triggering reliance was necessary.

{¶30} Taken together, these two warranties impose complementary requirements. Goods are generally *of merchantable quality* if they are fit for the purpose for which such goods are ordinarily used or sold and if they conform to the representations on their labelling. Goods are *suitable for their intended purpose* if they are "fit and appropriate" to be used in the manner the seller knows the buyer intends to use them. Thus, whether a good is *merchantable* will be the same from buyer to buyer, but whether a good is *suitable for its intended purpose* will turn on the intent and knowledge of the particular buyer and seller. The Official Comment to the

UCC offers a helpful illustration: "For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains." UCC 2-315, Official Comment 2.

**{¶31}** We therefore hold that, under the plain and unambiguous text of clause (c) of the Agreement's warranty provision, US LBM promised that the goods it sold would be fit and appropriate, both for the ordinary purposes for which such goods would be used, and for any particular purpose that US LBM knew Rialto would use them.

### b. Applicability

**{¶32}** US LBM argues that these warranties could not apply to ExtremeGreen, because Rialto had "unquestionably selected the product . . . and mandated that US LBM provide the Product to the Project in accordance with the Agreement." US LBM does not contest that the Agreement clearly "warrant[ed] that the material or goods furnished pursuant to this Agreement" would be merchantable and suitable for their intended purpose. However, US LBM contends that reading the warranties to cover deficiencies in ExtremeGreen *itself* would force US LBM into "a Catch-22," in which US LBM must "either breach the agreement by not supplying the Product or breach the agreement by supplying the Product."

**{¶33}** But US LBM omits its third option: refuse to sign an agreement that, by its plain terms, committed US LBM to warranting the capabilities of an unknown product. Such a refusal may have cost US LBM the contract, of course, but that is not a "Catch-22"; it is proof that Rialto valued buying from a seller who was willing to shoulder the risk that ExtremeGreen would be substandard. Special-order merchants across Ohio confront such decisions every day. As the UCC's official comment makes clear, even without an express warranty, a "specific designation of goods by the buyer

*does not exclude the seller's obligation* that they be fit for the general purposes appropriate to such goods." (Emphasis added.) UCC 2-314, Official Comment 3. Thus, special-order merchants must choose between (1) selling an unfamiliar product and assuming the risk that it will not be "merchantable," or (2) disclaiming the warranty and perhaps losing the sale. A merchant who chooses the former path may hope that the product performs as intended, but it consents to bear the costs if it does not (perhaps comforted by the hope of legal remedies against the manufacturer).

**{¶34}** US LBM signed an Agreement warranting all materials or goods it furnished thereunder. We are obligated to enforce that Agreement as written. We therefore hold that US LBM fully and unambiguously warranted that the ExtremeGreen it furnished would be "of merchantable quality and suitable for the purposes for which [it was] intended."

### c. Disputes of Material Fact

**{¶35}** Having established the meaning and applicability of the Agreement's warranties of merchantability or suitability for intended purpose, we consider now whether any disputes of material fact precluded the trial court from determining, at the summary-judgment stage, whether US LBM breached either warranty.

### i.

**{¶36}** To prove breach of these warranties, Rialto had to show that the ExtremeGreen it received was not fit and suitable—either for the ordinary purpose for which such products are used, or for the particular purpose for which Rialto expressly planned to use it. To make this showing, Rialto introduced depositions, affidavits, and reports from two experts: acoustical engineer Ryan Skoug of ESI Engineering, Inc., and engineer Edward L. Fronapfel of Charles Taylor Engineering Technical Services ("CTETS").

14

**{¶37}** Skoug and Fronapfel explained that ExtremeGreen was meant to be used as part of a "floor/ceiling assembly." The reports used two measurements to describe an assembly's ability to prevent noise transmission. An assembly's "sound transmission class" ("STC") rates how well it impedes the transmission of airborne noises, like speech or music. "Impact insulation class" ("IIC") rates how well an assembly insulates against impact noises, like footfalls or dropped items. A higher STC and IIC means greater insulation and less noise for neighbors.

**{¶38}** When tested in the field, these scores are reported as *apparent* sound transmission class ("ASTC") and *apparent* impact insulation class ("AIIC") ratings. Generally, the experts said, an assembly's field-tested ASTC and AIIC scores are expected to be approximately five points beneath its lab-tested STC and IIC scores.

**{¶39}** Fronapfel's report and Skoug's affidavit attested that the then-current version of the International Building Code required floor/ceiling assemblies between separate dwelling units to have an STC and IIC of at least 50—or an ASTC and AIIC of at least 45 if tested in the field. And both Fronapfel's report and Skoug's deposition testimony stated that the Kentucky Building Code adopted the International Building Code standards in this respect.

**{¶40}** Skoug further opined that, based on his "experience and on public references," floor/ceiling assemblies between "luxury" units would be expected to have an STC and IIC of 60 (or an ASTC and AIIC of 55 if field-tested).

**{¶41}** To determine how ExtremeGreen stacked up, Skoug performed a series of acoustical tests in three units of each of the Project's five buildings. These 15 tests yielded (1) ASTC scores from 39 to 50, with an average of 46, and (2) AIIC scores from 37 to 41, with an average of 39. These results were below the lab results offered by ExtremeGreen's manufacturer, who claimed that ExtremeGreen assemblies scored

STC 60 and IIC 55 (correlating to an expected ASTC 55 and AIIC 50 in the field).

**{¶42}** Skoug also averred that the "typical assembly that Rialto has used for other apartment buildings," which did *not* employ ExtremeGreen, would have lab ratings of STC 60 and IIC 53 (translating to an expected ASTC 55 and AIIC 48).

**{¶43}** Thus, the relevant ASTC and AIIC scores cited in Rialto's expert reports, testimony, and affidavits, were as follows:

| | ASTC | AIIC |
|---|---|---|
| *"Luxury" Standard (per Skoug)* | 55 | 55 |
| *ExtremeGreen Assemblies (Manufacturer Tests)* | 55 (est. based on STC 60) | 50 (est. based on IIC 55) |
| *Traditional Assembly (from Skoug Report)* | 55 (est. based on STC 60) | 48 (est. based on IIC 53) |
| ***ExtremeGreen Assemblies (Skoug Tests)*** | **46 (average) [range: 39-50]** | **39 (average) [range: 37-41]** |
| *International/Kentucky Building Code Minimum* | 45 | 45 |

**{¶44}** The AIIC of all 15 tested ExtremeGreen assemblies was below the minimum building-code standards. And while the average ASTC of the tested units was above the building code's minimum, some ExtremeGreen assemblies tested below that threshold. No tested assemblies met the "luxury" standards or the manufacturer-provided ratings cited by Skoug.

**{¶45}** Ultimately, Skoug opined that "the ExtremeGreen MGO used at the Project significantly failed at providing the specified sound isolation, may not have the ability to provide the specified sound isolation in a field installed application, and is not suitable for its intended use." Fronapfel similarly averred that "CTETS agrees with the [Skoug] Report that the STC and IIC ratings as measured at [the Project] show that the product fails to perform as specified in the manufacturer's specifications nor does

16

it meet minimum code requirements. CTETS is of the opinion that the ExtremeGreen MGO assembly used at [the Project] is defective and not suitable for its intended purpose."

**{¶46}** If a reasonable factfinder credited this evidence, it could permissibly find that the ExtremeGreen furnished by US LBM had failed to conform to one or both warranties in several ways.

**{¶47}** *First*, a factfinder could reasonably conclude that, to be fit for its intended purpose, a flooring component should (when installed in a proper assembly) satisfy minimum, widely-accepted building-code standards for between-unit sound transmission. If it so concluded, and if it accepted the opinion of Rialto's experts, then the factfinder could conclude that ExtremeGreen had failed to conform to the Agreement's warranty of merchantability.

**{¶48}** *Second*, a reasonable factfinder could conclude that US LBM knew Rialto intended to use ExtremeGreen for between-unit floor/ceiling assemblies, and that US LBM knew that such assemblies would need to meet code minimums. If the factfinder reached this conclusion and accepted Rialto's experts' testimony, it could find that the ExtremeGreen provided by US LBM was not suitable for its intended purpose.

**{¶49}** *Third,* a reasonable factfinder could conclude that the manufacturer's representations as to ExtremeGreen's sound-insulation properties created a standard of merchantability, which the delivered ExtremeGreen failed to live up to. This logic would provide an alternative basis on which a factfinder could find that ExtremeGreen failed to conform to the warranty of merchantability.

**{¶50}** However, no reasonable factfinder could conclude, based on this evidence, that ExtremeGreen was not suitable for its intended purpose because it

failed to meet the "luxury" standards described by Skoug (STC/IIC 60; ASTC/AIIC 55). Skoug's report stated that the laboratory data Rialto had received from ExtremeGreen's manufacturer stated that, when installed in a standard assembly, ExtremeGreen would yield an IIC 55 rating. The evidence suggests that Rialto had no reason to expect ExtremeGreen to exceed this score to achieve the "luxury" scores of IIC 60 or AIIC 55. Absent some clearer indication, Rialto could not have reasonably understood US LBM to promise, under a general warranty of fitness for purpose or merchantability, that ExtremeGreen would produce "luxury" noise-isolation ratings better than those expressly specified by the manufacturer. *Compare* R.C. 1302.30(A) [UCC 2-317(1)] (in determining which of two conflicting warranties controls, "[e]xact or technical specifications displace an inconsistent sample or model or general language of description"). Summary judgment on that issue was therefore proper.

ii.

{¶51} Despite Skoug's comparative testing, US LBM contends that Rialto has failed to establish that ExtremeGreen *itself* was the cause of the substandard scores—only that it had been part of an *assembly* that scored poorly. Without a test of the ExtremeGreen in isolation, US LBM contends, we have no proof that the ExtremeGreen was the culprit, and not some other substandard component or faulty installation.

{¶52} But Rialto provided ample circumstantial evidence from which a factfinder could infer the ExtremeGreen was to blame for the noisy units. The testimony and reports suggested that the other components in the ExtremeGreen assemblies were not the problem: the construction of the bottom portion of the ExtremeGreen assemblies mirrored the construction of a standard floor/ceiling assembly, using gypsum board, a "resilient channel," wooden trusses, and batt for

insulation. Skoug testified that the tested ExtremeGreen assemblies used ordinary, "tried and true" components for these portions of the assemblies, and that the performance of such components could be easily anticipated. Further, Skoug testified that he had examined several of these components and saw no obvious installation issues.

**{¶53}** The Fronapfel Report suggested that the deficient performance was not caused by a failure to follow installation instructions. Fronapfel stated that the "observed construction substantially conforms to the tested assemblies" that the manufacturer had claimed scored ratings of STC 60 and IIC 55. This, Fronapfel opined, "points to an issue with the assembly and product rather than construction defects."

**{¶54}** The Skoug Report even offered a mechanical explanation for why ExtremeGreen may have caused the noise problem. During his testing, Skoug observed greater than normal amounts of "structureborne noise and vibration flaking," which he opined "were due to the ExtremeGreen assembly eliminating the gypsum concrete and entangled mesh underlayment from the floor/ceiling assembly." This change, which was allegedly part of the assemblies the manufacturer had tested, allowed "acoustic energy in the floor [to be] more easily carried between stacked apartments through the structural wall and floor components."

**{¶55}** Further, Rialto offered evidence that could persuade a jury that testing ExtremeGreen on its own was not feasible. In his deposition, Skoug testified that engineers "can't just do an STC or an ICC or any other kind of acoustic test of the product itself and determine if, in a floor/ceiling assembly, it meets some requirement." While such a test could, in theory, be performed, "it wouldn't have any meaning." Instead, engineers like Skoug test items used "within a floor/ceiling

19

assembly, either in the laboratory condition or when . . . tested in the field."

**{¶56}** US LBM insists that Ohio caselaw requires more. It cites two Sixth District cases, *Roman v. Volkswagen of Am., Inc.*, 2008-Ohio-2086 (6th Dist.), and *Teetors v. Benson Truck Bodies*, 1994 Ohio App. LEXIS 705 (6th Dist. Feb. 25, 1994), for the proposition that a factfinder cannot generally presume, absent evidence, that an assembly's deficient performance is attributable to a particular cause or component.

**{¶57}** We agree with the rule expressed in *Roman* and *Teetors* as a general matter, but hold that Rialto easily clears that hurdle. A closer look at those cases makes clear why.

**{¶58}** In *Roman*, a breach-of-warranty plaintiff "failed to offer any evidence that [her] engine's malfunction was due to a defect in manufacturing that was present at the time the vehicle left [the manufacturer's] control," as required by the express warranty in that case. *Roman* at ¶ 22. *Roman* differs from this case, because the plaintiff in *Roman* could point to *no cause* of the sludge that had ruined her engine, and *no reason* for her engine malfunction apart from the sludge. *See id.* at ¶ 20. Beyond this, all she could show was that she had properly maintained her vehicle. *Id.* at ¶ 22. But here, Rialto's experts expressly opined as to causation. And their reports and testimony supported their opinions by eliminating most other components as possible causes of the noise and by providing a credible mechanical explanation.

**{¶59}** In *Teetors*, the court granted summary judgment against a product-liability plaintiff because his expert had opined that the plaintiff's injury had been caused *either* by a part manufactured by the defendant *or* by another, unrelated part. *Teetors*, 1994 Ohio App. LEXIS 705, at *6. But that is a far cry from this case, in which Skoug concluded, based on the data and mechanical analysis provided in his report,

that "the ExtremeGreen MGO used at the Project significantly failed at providing the specified sound isolation, may not have the ability to provide the specified sound isolation in a field installed application, and is not suitable for its intended use." Skoug's conclusion offered clear evidence that ExtremeGreen caused the deficiencies in the sound isolation—not equivocation and ambiguity, as in *Teetors*.

**{¶60}** The testimony, affidavits, and reports of Skoug and Fronapfel offered circumstantial evidence that ExtremeGreen was the cause of the Project's noise problems, and Skoug directly stated that ExtremeGreen failed to perform as promised. At bottom, US LBM asks that we disbelieve Skoug's conclusion and decline to draw any inferences from Skoug's and Fronapfel's statements failing to identify another cause. But a reasonable factfinder could accept Skoug's opinion based on the data and opinions he and Fronapfel provided, so we must do likewise at this stage.

iii.

**{¶61}** Rialto's experts provided evidence from which a reasonable factfinder could conclude that ExtremeGreen was not merchantable or suitable for its intended purpose—either because assemblies constructed with ExtremeGreen failed to reasonably conform to the manufacturer's representations or because they failed to meet relevant building-code minimums.

**{¶62}** But while a reasonable factfinder *could* reach these conclusions, it would not be required to do so. US LBM pointed to evidence casting some doubt on Rialto's case. For example, US LBM pointed to testimony that Rialto may have stored the ExtremeGreen improperly. This fact, taken in conjunction with the manufacturer's high listed STC and IIC ratings for ExtremeGreen, would be sufficient to create a jury question regarding the cause of ExtremeGreen's deficient performance.

**{¶63}** We therefore hold that disputes of material fact precluded the trial court

from entering summary judgment for *either* party on Rialto's claims for breach of the warranties of merchantability and fitness for intended purpose.

### 2. *Warranty Against Design Defects*

**{¶64}** In the Agreement, US LBM also warranted that the goods and materials it delivered would be "free from defects in design except to the extent that such items comply with any detailed designs provided by" Rialto. Rialto contends that the ExtremeGreen it received failed to conform to this warranty as well. We hold that this claim fails as a matter of law.

**{¶65}** "Defect in design," like "merchantable quality," has a commonly understood legal meaning. *Black's Law Dictionary* defines "design defect" to mean an "imperfection occurring when the seller or distributor could have reduced or avoided a foreseeable *risk of harm* by adopting a reasonable alternative design, and when, as a result of not using the alternative, the product or property is *not reasonably safe*." (Emphasis added.) *Black's Law Dictionary* (11th Ed. 2019). The Third Restatement of Torts likewise states that a product "is defective in design when the *foreseeable risks of harm* posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . , and the omission of the alternative design renders the product *not reasonably safe*." (Emphasis added.) *See* Restatement of the Law 3d, Torts, Products Liability, § 2(b) (1998).

**{¶66}** These definitions, all of which draw on the common law of products liability, focus on a product's safety and the risk of harm. They do not encompass products that are merely ineffective or substandard, as Rialto alleges the ExtremeGreen here was.

**{¶67}** Context suggests that, as it is used in the Agreement, "defect in design" was intended to carry this safety-focused, *legal* meaning, rather than its broader,

colloquial definition. This is so for two reasons.

**{¶68}** *First*, the surrounding warranty provisions clearly use legal terms like "defects in title" and "merchantable quality" in their legal sense. A word is known by the company it keeps, and the meaning of an ambiguous or broadly-worded list item will often be informed by the words that surround it. *Compare* Scalia & Garner, *Reading Law*, § 31, at 195 ("When several nouns or verbs or adjectives or adverbs— any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). The Agreement's surrounding terms therefore suggest we should read "defect in design" in its ordinary *legal* sense. *See* Scalia & Garner, § 6, at 73.

**{¶69}** *Second*, reading "defect in design" to cover failings that lead to poor performance as well as those that jeopardize safety would create substantial overlap with the warranty of merchantability. If a product operates as described and as an ordinary product of that type should (i.e., is "merchantable"), by what standard could a factfinder say that product was defective in its design, save for reasons of safety? We presume the contract's drafters did not intend such redundancy.

**{¶70}** We therefore hold that the warranty against "defects in design" in the Agreement constituted a promise that the products US LBM delivered would not be designed in a manner that created an unreasonable risk of harm, damage, or injury to person or property. It did *not* cover mere deficiencies in the products' *performance* of their intended functions, except to the extent those deficiencies created risks of harm.

**{¶71}** Because Rialto has neither alleged that ExtremeGreen's design created an unreasonable risk of harm to person or property, nor offered evidence to that effect, we hold that the trial court properly awarded US LBM summary judgment on Rialto's

claim for breach of the design-defect warranty.

### 3. The "Detailed Design" Exception

**{¶72}** US LBM next argues that it cannot be held liable because its warranties did not apply "to the extent that such items comply with any detailed designs provided by" Rialto. By specifically requesting ExtremeGreen, US LBM asserts, Rialto was requiring it to "comply with" a "detailed design."

**{¶73}** But the text of the Agreement makes clear that the detailed-design exception applies only to the warranty against "defects in design." The exception does not appear in or apply to the Agreement's other warranties of merchantability or suitability for intended purpose. Because we have already held that the trial court properly rejected Rialto's design-defect-warranty claim, we need not consider whether the delivery of ExtremeGreen fell within this detailed-design exception.

### 4. Failure to Show Damages

**{¶74}** In its final argument for summary judgment on the warranty claims, US LBM argues that, even assuming Rialto successfully showed that the delivered ExtremeGreen breached some warranty, Rialto still "failed to prove that it has been damaged by [US LBM's] provision of the Product or by any other alleged breach of the agreement." Specifically, US LBM argues that the calculations and testimony of Rialto's damages expert were unreliable or uncertain.

**{¶75}** A court may grant summary judgment for a defendant where a plaintiff claiming breach of contract "has failed to provide evidence of economic damages resulting from the breach of contract and has failed to seek injunctive relief or specific performance of a contractual duty, but instead rests his or her right to proceed to trial solely on a claim for nominal damages." *DeCastro v. Wellston City School Dist. Bd. of Edn.*, 2002-Ohio-478, ¶ 21. But this rule is limited. It covers only those cases "in which

the plaintiff not only failed to provide evidence of actual damages in response to a motion for summary judgment but *could not even theorize the existence of economic damages.*" (Emphasis added.) *Id*. at ¶ 15.

**{¶76}** But Rialto does not claim an intangible, unmeasurable, and ephemeral loss like the *DeCastro* plaintiff, who sued because his "four-day in-school suspension" had caused him to "miss out on 'activities that are unique to the final days of a high school senior.'" *Id*. at ¶ 3. In this case, Rialto offered plenty to support a theory of economic damages. *First*, Rialto's proof of breach, if credited, would itself suggest economic loss. Rialto provided evidence that ExtremeGreen was unfit for its intended or ordinary purpose. That means damages, whether conceptualized as the amount Rialto overpaid for a substandard component or as the cost of replacement. *Second*, even if a theory of economic damages were not self-evident, Rialto offered an affidavit from Seth Guttman, the vice president of its property-management company, that supported the existence of consequential damages. Guttman averred that, "due to the noise issues, Rialto has been damaged through lost rent, unit turnover costs, additional administrative costs to assess noise complaints, costs of temporary repairs, diminished property value, and the inability to raise rents to market rates." This was clear evidence of consequential damages.

**{¶77}** Rialto was not required to quantify its damages to survive US LBM's summary-judgment motion. And because Rialto did not seek summary judgment on damages in its favor, it was required to present only a colorable theory of economic harm to proceed. It did so.

### D. Indemnity Claim

**{¶78}** Rialto's final argument concerns the Agreement's indemnification provision, which reads as follows:

> **INDEMNIFICATION.** Seller will indemnify and hold Owner harmless from actual claims, costs, proceedings, judgments, liabilities, and expenses, including without limitation, reasonable attorney fees that result from, or are related to, the claimed breach of any of Seller's warranties, the goods or materials being defective, the goods or materials being negligently designed or manufactured, or the failure of Seller to perform any of its obligations under the terms of the Agreement, including but not limited to timely delivery of the goods, materials or services that are the subject of this Agreement, except when such claims, costs, proceedings, judgments, liabilities, and expenses result proximately from (a) Owner's gross negligence or (b) Owner's breach of a statutory or legal duty.

Rialto contends that this provision allows it to recover fees, costs, and expenses associated with litigating US LBM's breach of warranty. US LBM counters that Rialto's right to indemnification for costs and fees is triggered only by *third-party* claims, not by a direct action between the contracting parties for breach. The trial court agreed with US LBM. *See Rialto I*, 2025 Ohio Misc. LEXIS 804, at *5-6. We agree with the trial court.

**{¶79}** Contracting parties can structure their indemnity agreements to compel the indemnitor to compensate the indemnitee for the indemnitee's litigation expenses. *See Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238 (1987), syllabus. The "historical scope" of such provisions, however, was limited to remuneration for litigation expenses incurred in litigation between the indemnitee and *third parties. See Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir. 2003), citing Restatement of the Law, Restitution, § 76 and Comment b (1937).

**{¶80}** Parties can also bargain for a specific provision to shift attorney fees and litigation costs, in the event of a lawsuit. *Wilborn v. Bank One Corp.*, 2009-Ohio-306, ¶ 7. But such provisions are ordinarily distinct from general indemnity provisions.

**{¶81}** Here, Rialto seeks to shift fees incurred in a direct action between the contracting parties in the absence of an express fee-shifting clause. The question, then, is whether the Agreement's indemnification provision covered such fees.

**{¶82}** The answer depends on context. The term "indemnify" and its variants can, in some cases, be broad enough to cover fees and costs incurred as part of interparty litigation. *See Black's Law Dictionary* (11th Ed. 2019) (defining "indemnify" as to "reimburse (another) for a loss suffered because of a third party's conduct or one's own act or default," and "indemnity" as a party's "duty to make good any loss, damage, or liability incurred by another"). However, given the prevalence of distinct fee-shifting provisions, some courts have looked to context to determine whether a general indemnification provision was intended to allow for the shifting of fees and costs in an interparty dispute.

**{¶83}** *Menard, Inc. v. Dipaolo Indus. Dev., L.L.C.*, 2023-Ohio-1188 (11th Dist.), provides one example of this contextual analysis. In *Menard*, the Eleventh District held that a contract's broadly-worded indemnification provision did not permit fee-shifting in an interparty action, because the next sentence of the contract referred to the plaintiff's right to settle claims without defendant's consent, in the event defendant failed to "defend" plaintiff. *Id.* at ¶ 50. Because an indemnitor cannot "defend" the indemnitee against the indemnitor's own claims, the court held that context counseled that the parties had contemplated that the indemnification clause could not have been meant to cover interparty disputes. *Id.* at ¶ 55-56.

**{¶84}** The Federal Court of Appeals for the Sixth Circuit, applying Ohio law,

27

has shown a similar sensitivity to context in *Mead*, 319 F.3d 790. There, the court considered a promise to "'indemnify and hold Purchaser and its agents . . . harmless from and against all expenses, costs, charges, damages, claims, suits, losses or liabilities (including attorneys fees) of every kind whatsoever to the extent caused by the negligence of Seller.'" *Id.* at 797. The Sixth Circuit concluded that this broad language (very much like the language in the Agreement here) did not include a right to attorney fees incurred in an interparty action. *Id.* at 797-798. The expansive language, the court said, was rendered ambiguous by a different contractual provision that limited all liability, "'[e]xcept for third party claims for injury . . . [and] property damage for which Seller may be liable subject to Indemnity.'" *Id.* at 798. To resolve the ambiguity, the Sixth Circuit construed the clause contra proferentem, resolving it against the purchaser. *Id.*; *see also* Scalia & Garner, *Reading Law*, at 427 (defining "*contra proferentem* rule"). It therefore held that the indemnity provision required the seller to hold the purchaser harmless, not for fees incurred in a direct, interparty action, but "only for third-party claims, which is the historical scope of usual indemnification provisions." *Mead* at 798, citing Restatement of the Law, Restitution, § 76 and Comment b (1937).

{¶85} Not every Ohio case is so context sensitive; the Third District appears to have adopted a more categorical rule. In *United Gulf Marine, L.L.C. v. Continental Refining Co., L.L.C.*, 2019-Ohio-666, ¶ 19 (3d Dist.), the Third District considered a broad indemnity provision that included a general promise to indemnify for attorney fees, but no reference to direct, interparty litigation. Nevertheless, the Third District held that the "plain language of the indemnity provision" had clearly and unambiguously promised indemnity for attorney fees incurred in direct litigation between the contracting parties. *Id.* at ¶ 24. To support its broad reading, however, the

*United Gulf Marine* court could muster only one case in which a court had treated an indemnification clause as covering expenses incurred in direct, interparty litigation: its own opinion in *Heffner Invests. Ltd. v. Piper*, 2008-Ohio-2495 (3d Dist.). And *Piper*, in turn, cited no cases to justify its implicit assumption that a promise to "indemnify, defend and save harmless" a landlord for attorney fees necessarily included an agreement to *shift* attorney fees incurred in an action for breach of the lease. *See id.* at ¶ 50-61.

**{¶86}** Given the historical understanding of indemnification as providing reimbursement for third-party claims, and given the prevalence of separate fee-shifting provisions, we disagree with the Third District's categorical rule. It is entirely plausible—perhaps even likely—that an offeree would read a promise to indemnify the offeror for litigation expenses against the historical backdrop that one indemnifies another against *third-party* claims.

**{¶87}** We instead adopt a context-sensitive inquiry like that employed by the Eleventh District and Sixth Circuit. When determining if a general promise to indemnify for litigation expenses applies to expenses incurred in direct litigation between the contracting parties, a court should ask (1) whether that indemnification provision expressly permits or excludes fee awards in direct, interparty actions, and, if not, (2) whether anything in the contract's other provisions or structure suggest that the indemnification clause was intended to go beyond the traditional understanding of indemnity to impose fee shifting between contracting parties. *Compare Mead*, 319 F.3d at 798. If, after considering these questions, the court still has no clear answer, it should employ standard interpretive tools to resolve the ambiguity. This could include factfinding or the contra proferentem canon. *Compare id.*

**{¶88}** In this case, we hold that the Agreement is ambiguous as to whether,

under the indemnification provision, US LBM must pay for costs and fees Rialto incurred in this direct action between the parties. No language in the Agreement affirmatively includes or excludes indemnification for fees incurred in an interparty action—it speaks only to indemnification for fees and costs generally. Further, reading the Agreement's use of "indemnify" to encompass interparty litigation does not fit with other words in the same list. Under Rialto's reading, US LBM would be obligated to "indemnify and hold [Rialto] harmless from actual claims . . . , judgments, [or] liabilities" Rialto accrues *to US LBM*. Thus, if US LBM received a judgment against Rialto, US LBM could potentially be obligated to pay itself.

**{¶89}** "[W]here there is doubt or ambiguity in the language of a contract it will be construed strictly against the party who prepared it." *McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77, 80 (1967); *see also* 18 Ohio Jur.3d, Contribution, Indemnity, and Subrogation, § 29 (2024). Here, Rialto prepared the Agreement, so Rialto cannot claim the benefit of the ambiguity it created. *Compare Mead Corp.*, 319 F.3d at 798. Accordingly, we hold that the Agreement's indemnification provision does not require US LBM to "indemnify and hold [Rialto] harmless" for "costs," "expenses," or "fees," arising out of litigation between the parties regarding a breach of the Agreement. The trial court therefore properly granted summary judgment to US LBM on its claims under the indemnification clause.

## III. CONCLUSION

**{¶90}** Issues of material fact precluded summary judgment on some—but not all—of Rialto's claims, so we sustain Rialto's first assignment of error in part and overrule it in part. However, those same disputes also precluded awarding summary judgment for Rialto, so we overrule its second assignment of error.

**{¶91}** We reverse the trial court's summary judgment for US LBM on Rialto's

claims for breach of its express warranties that the products it delivered would be of merchantable quality and suitable for their intended purposes, in the manner and to the extent described above. We affirm the trial court's summary judgment for US LBM in all other respects, and we affirm its denial of Rialto's motion for partial summary judgment. The cause is remanded so that litigation can proceed on Rialto's remaining claims in a manner consistent with the law and this opinion.

Judgment affirmed in part, reversed in part, and cause remanded.

**KINSLEY, P.J.,** and **MOORE, J.,** concur.